UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

STEPHANIE SCHOLL,

FRANK BEDNARZ,

      Plaintiffs,

         v.

ILLINOIS STATE POLICE,

BRENDAN F. KELLY, in his official capacity as Director of the Illinois State Police,

JAY R. PRITZKER, in his official capacity as Governor of Illinois,

KWAME RAOUL, in his official capacity as Attorney General of Illinois

      Defendants.

Case No. 24-cv-4435

Judge Martha M. Pacold

**MEMORANDUM OPINION AND ORDER**

This case presents a Fourth Amendment challenge to Illinois's automatic license plate reader program. Plaintiffs Stephanie Scholl and M. Frank Bednarz live and drive in Cook County, Illinois. *Id.* ¶¶ 5–6. Defendants are Illinois Governor Jay R. Pritzker, Illinois Attorney General Kwame Raoul, Illinois State Police Director Brendan F. Kelly, and the Illinois State Police. *Id.* ¶¶ 7–10. All defendants are sued in their official capacities. *Id.* ¶ 11.

Plaintiffs bring this suit under 42 U.S.C. § 1983, claiming that defendants violated their Fourth Amendment rights. Plaintiffs move for a preliminary injunction. [14]. Defendants move to dismiss the complaint under Rule 12(b)(1), for lack of subject-matter jurisdiction, and Rule 12(b)(6), for failure to state a claim. [22]. For the reasons stated below, plaintiffs' motion for a preliminary injunction is denied, and defendants' motion to dismiss is granted.

## BACKGROUND

At the pleading stage, the court "accept[s] all well-pleaded factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff." *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015).

Six years ago, United States Postal Service worker Tamara Clayton was fatally shot on the I-57 highway. [1] ¶ 14.[1] "This unfortunate expressway shooting sparked a movement within the community, Illinois State Police (ISP), Illinois Department of Transportation (IDOT), local police agencies, and the Governor's office." *See Ill. State Police, Automated License Plate Reader – Transparency Page*, https://isp.illinois.gov/CriminalInvestigations/TransparencyPage (last visited March 31, 2025).[2] On January 1, 2020, Illinois enacted the Tamara Clayton Expressway Camera Act to fund the installation of approximately 300 cameras—known as "automated license plate readers" or "ALPRs"—across Cook County expressways. [1] ¶ 15; *see* 605 ILCS 140/1 *et seq*. Two years later, Illinois passed a statute appropriating additional funds and extending the program to twenty other counties. *Id.* ¶ 22. To date, the Illinois State Police has installed 344 cameras in Cook County, 78 in St. Clair County, and 44 across 17 other counties.[3]

This surveillance program works in two steps. Installed on the side of a road, ALPRs photograph (or "detect") the license plates of vehicles driving by. [1] ¶ 16. The system then uploads the photo to the Law Enforcement Archival Reporting Network ("LEARN") database. *Id.* ¶ 31. This national database compiles and stores billions of license plate photos taken by ALPRs in Illinois and elsewhere. *Id.* ¶ 32.

Law enforcement agencies across the country flag "hot plates" of vehicles that are targets of investigation—for instance, if the car is reported stolen, is used as the getaway vehicle in a bank robbery, or has expired registration. *Id.* ¶ 27. License plate photos sit idle in the database until there is a "hit"—when an ALPR "detects" a hot plate. *Id.* ¶¶ 27–28. When police receive notification of the hit, they can enter the LEARN database to retrieve the license plate photo and associated metadata of when and where the photo was taken. *Id.* This information allows police to "see what cars passed by that area at the relevant time and to whom those vehicles are registered."

---

[1] Bracketed numbers refer to docket entries and are followed by page or paragraph number citations. Page numbers refer to the CM/ECF page number.

[2] This webpage is cited throughout the complaint. [1] ¶¶ 15, 21–23; *see Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) (explaining that the court may consider "documents that are critical to the complaint and referred to in it").

[3] *See Ill. State Police, Automated License Plate Reader Statistics Dashboard*, https://isp.maps.arcgis.com/apps/dashboards/77d1b36b7d9f419289cffe58d8ac9e54 (referenced in [1] ¶¶ 24–28).

*Id.* ¶¶ 16, 19. Last month, ALPRs in Illinois recorded 200,161,762 detections and 5,747,483 hits.[4]

Under the Expressway Camera Act, an Illinois State Police officer may retrieve a license plate photo from the database to investigate "any offenses involving vehicular hijacking, aggravated vehicular hijacking, terrorism, motor vehicle theft, or any forcible felony, including, but not limited to, offenses involving the use of a firearm[.]" 605 ILCS 140/5(b). They may also retrieve a photo "to detect expressway hazards and highway conditions; and to facilitate highway safety and incident management." *Id.* By statute, "[a]ll images from the cameras shall be deleted" from the LEARN database "within 120 days, unless the images are relevant to an ongoing investigation or pending criminal trial." *Id.*

Plaintiffs challenge the Expressway Camera Act and Illinois's warrantless use of ALPRs as unconstitutional under the Fourth Amendment. They bring this challenge under 42 U.S.C. § 1983, seeking injunctive relief and attorneys' fees—but not compensatory damages.

Plaintiffs also ask the court to preliminarily enjoin defendants "from accessing ALPR data unless they first obtain a warrant"—in other words, to order defendants to obtain a warrant before they enter the LEARN database to retrieve information about a "hot plate." [15] at 13. Plaintiffs have not asked the court to preliminarily compel defendants to "deactivate or remove the cameras." *Id.* In short, the requested preliminary injunction does not target the process of "detection," but the process of following up on a "hit." The requested *permanent* injunction, by contrast, seeks to enjoin both—the warrantless use of ALPRs (the process of "detection") *and* the LEARN database (the process of following up on a "hit").

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) permits a party to move for dismissal due to lack of subject-matter jurisdiction. In evaluating a motion under Rule 12(b)(1), the court must first determine whether the motion raises a factual or facial challenge to subject-matter jurisdiction. *See Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). Here, defendants have raised a facial challenge to subject-matter jurisdiction, contending that the complaint does not sufficiently allege a basis for subject-matter jurisdiction. *See id.* ("[A] facial challenge argues that the plaintiff has not sufficiently 'alleged a basis of subject matter jurisdiction.'" (quotation omitted)). Courts adjudicating facial challenges to subject-matter jurisdiction "must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff." *Id.*

---

[4] *See Ill. State Police, Automated License Plate Reader Statistics Dashboard,* https://isp.maps.arcgis.com/apps/dashboards/77d1b36b7d9f419289cffe58d8ac9e54.

Next, Rule 12(b)(6) permits the defendant to move for dismissal on the merits—for failure to state a claim. In evaluating a motion to dismiss under Rule 12(b)(6), the court must determine whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[N]aked assertion[s] devoid of further factual enhancement" are insufficient. *Id.* (quoting *Twombly*, 550 U.S. at 557).

Last, "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "The two most important considerations are likelihood of success on the merits and irreparable harm." *Bevis v. City of Naperville*, 85 F.4th 1175, 1188 (7th Cir. 2023).

## DISCUSSION

### I.     Threshold Objections

Defendants raise a series of threshold objections. First, they argue that plaintiffs lack an injury-in-fact sufficient to confer Article III standing. Next, they argue that plaintiffs' claims violate the rule against third-party standing. Finally, they argue that the claims against certain defendants are barred by sovereign immunity. The court will address each objection in turn.

### A.     Injury-in-Fact

Article III "confines" federal jurisdiction "to 'Cases' and 'Controversies.'" *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024). One aspect of the Case or Controversy requirement is the doctrine known as "standing." Standing requires a plaintiff to "have a 'personal stake' in the case." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)). This "irreducible constitutional minimum . . . contains three elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Those elements are an "injury in fact, a causal connection between the injury and the defendant's conduct, and likely redressability through a favorable decision." *Winkler v. Gates*, 481 F.3d 977, 979 (7th Cir. 2007). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561.

Injury-in-fact is the "[f]irst and foremost" requirement. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. at 103. This requirement must be satisfied "separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000); *see City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983). Depending on what relief is sought, the alleged injury must be either "actual" or "imminent"—in other words, it "must have already occurred or be likely to occur

4

soon." *All. for Hippocratic Med.*, 602 U.S. at 381. A plaintiff seeking only retrospective damages may rely solely on past injuries. However, only "a person exposed to a risk of future harm may pursue forward-looking, injunctive relief." *TransUnion*, 594 U.S. at 435; *see Lyons*, 461 U.S. at 109.

Here, plaintiffs seek forward-looking, injunctive relief.[5] *See* [1] ¶¶ 49A–C. To establish standing, they must demonstrate a risk of future harm that is "sufficiently imminent and substantial." *TransUnion*, 594 U.S. at 436. While the "threatened injury" need not be "literally certain," it must be "certainly impending." *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 410, 414 n.5 (2013) (quotation omitted); *see Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019) (explaining that there must be "a substantial risk that the harm will occur" (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).

### 1. Use of ALPRs

First, plaintiffs seek to enjoin the warrantless use of ALPRs to photograph motorists' license plates. As alleged, plaintiffs "regularly drive[] on the expressways in Cook County and the surrounding area, almost always using the same personal vehicle, including commuting from [their] home[s] in Cook County to work in the Chicago suburbs, as well as regular other trips by car in areas covered by Illinois' ALPR system." [1] ¶¶ 5–6. With "some 300 ALPR cameras across every expressway in Cook County," *id.* ¶ 15, one can reasonably infer that those cameras will photograph plaintiffs' license plates.

Indeed, courts routinely hold that the subjects of government surveillance have standing to challenge that surveillance. *See, e.g., Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 209 (4th Cir. 2017); *Schuchardt v. President of the U.S.*, 839 F.3d 336, 344–46 (3d Cir. 2016); *Am. C.L. Union v. Clapper*, 785 F.3d 787, 801–02 (2d Cir. 2015). "Whether or not such claims prevail on the merits, [plaintiffs] surely have standing to allege injury from the collection, and maintenance in a government database, of records relating to them." *Am. C.L. Union*, 785 F.3d at 801.

Defendants argue that plaintiffs' alleged injuries are not legally cognizable because plaintiffs' asserted privacy interests are not protected by the Fourth Amendment. [32] at 7. Defendants point to the Supreme Court's remark in *Byrd v. United States*, 584 U.S. 395 (2018), that "[t]he concept of standing in Fourth Amendment cases can be a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search." *Id.* at 410. But in a portion of that same sentence (which defendants elide), the *Byrd* Court clarified that Fourth Amendment

---

[5] Plaintiffs also request attorneys' fees, presumably under 42 U.S.C. § 1988. [1] ¶ 49D. That alone does not confer standing. *See Uzuegbunam v. Preczewski*, 592 U.S. 279, 272 (2021) ("A request for attorney's fees or costs cannot establish standing because those awards are merely a 'byproduct' of a suit that already succeeded, not a form of redressability.").

standing "should not be confused with Article III standing." *Id.* Thus, with respect to Fourth Amendment cases, *Byrd* does not abrogate the ordinary rule that the Article III standing inquiry is distinct from the merits inquiry. *See, e.g., Pearson v. Target Corp.*, 968 F.3d 827, 835 (7th Cir. 2020). The court must, as in other cases, "assume that the party asserting federal jurisdiction is correct on the legal merits of his claim" and "that a decision on the merits would be favorable." *Hassan v. City of New York*, 904 F.3d 277, 289 (3d Cir. 2015) (quoting *Cutler v. U.S. Dep't of Health & Hum. Servs.*, 797 F.3d 1173, 1179 (D.C. Cir. 2015)).[6]

### 2.     Use of the LEARN Database

Second, plaintiffs seek to enjoin the warrantless use of the LEARN database. *See* [15] at 13. However, the complaint does not allege any facts indicating a "substantial risk" that police will soon retrieve plaintiffs' license plate information from the database. *Susan B. Anthony List*, 573 U.S. at 158 (quoting *Clapper v. Amnesty Int'l*, 568 U.S. at 414 n.5). Plaintiffs do not allege any "intention to engage in a course of conduct" that might render their license plates relevant to a criminal investigation. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). Indeed, plaintiffs do not allege that they will soon commit (or be victims of) any of the offenses enumerated in the Expressway Camera Act—namely, "vehicular hijacking, aggravated vehicular hijacking, terrorism, motor vehicle theft, or any forcible felony[.]" 605 ILCS 140/5. Nor do plaintiffs allege that they will soon cause (or be subject to) "expressway hazards," such that their license plate information will be useful for "facilitat[ing] highway safety and incident management." *Id.* Absent additional allegations along these lines, plaintiffs face no greater risk of being "searched" than any other motorist in Cook County. *See Lyons*, 461 U.S. at 111 ("Absent a sufficient likelihood that he will again be wronged in a similar way, Lyons is no more entitled to an injunction than any other citizen of Los Angeles; and a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional.").

As alleged, defendants are "holding onto . . . mass surveillance data in case one day some police officer decides to target Plaintiffs for specific investigation." [1] ¶ 40. While "one day" need not be today or tomorrow, it must be some ascertainable time. *See Lujan*, 504 U.S. at 565 (explaining that "'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases

---

[6] Defendants' attempt to characterize plaintiffs' alleged constitutional injuries as abstract generalized grievances, [23] at 13, 15, is not persuasive. Plaintiffs allege violations of their Fourth Amendment right to be secure against "unreasonable" searches—a harm "specified by the Constitution itself." *TransUnion*, 594 U.S. at 426. The bare fact that a harm is "widely shared" is insufficient to negate standing. *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 24 (1998).

require"). Because their alleged constitutional injuries are not sufficiently imminent, plaintiffs lack standing to enjoin the warrantless use of the LEARN database.

## B.    Third-Party Standing

Defendants also frame plaintiffs' claim for injunctive relief as a claim brought "on behalf of third parties, which here appear[] to be every Illinois citizen." [23] at 17. Citing the principle that plaintiffs generally "cannot rest [their] claim[s] to relief on the legal rights or interests of third parties," *Warth v. Seldin*, 422 U.S. 490, 499 (1975), defendants argue that plaintiffs lack standing to enjoin the implementation of the Expressway Camera Act.

This argument is unpersuasive. Plaintiffs do not purport to assert the legal rights and interests of third parties; they assert their own. Because plaintiffs allege that the warrantless use of automated license plate readers infringes *their* right to be secure against unreasonable searches and seizures, [1] ¶ 49, their claims do not implicate the rule against third-party standing. *Cf. Plumhoff v. Rickard*, 572 U.S. 765, 778 (2014) ("Fourth Amendment rights are personal rights . . . ." (quoting *Alderman v. United States*, 394 U.S. 165, 174 (1969)).[7]

## C.    Sovereign Immunity

Next, defendants move to dismiss plaintiffs' claims on sovereign immunity grounds. Sovereign immunity "bars actions in federal court against a state, state agencies, or state officials acting in their official capacities"—whether for damages or injunctive relief. *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 520 (7th Cir. 2021) (quotation omitted); *see Cory v. White*, 457 U.S. 85, 91 (1982) (explaining that sovereign immunity bars suits against the state for injunctive relief). Suits against state officials in their official capacity amount to suits against the state itself. *Hafer v. Melo*, 502 U.S. 21, 25 (1991).

"A narrow exception to sovereign immunity, though, 'allows suits . . . for declaratory or injunctive relief against state officers in their official capacities.'" *Sherwood v. Marchiori*, 76 F.4th 688, 693 (7th Cir. 2023) (quoting *Reed v. Goertz*, 598 U.S. 230, 234 (2023)). "The *Ex parte Young* doctrine 'allows private parties to sue individual state officials for prospective relief to enjoin ongoing violations of federal law.'" *Council 31 of the Am. Fed'n of State, Cnty., and Mun. Emps., AFL-CIO v. Quinn*, 680 F.3d 875, 882 (7th Cir. 2012) (quotation omitted); *see also Ex parte Young*, 209

---

[7] To be sure, plaintiffs' requested injunction would affect defendants' investigative actions against third parties. But even if the court were to find such broad relief inappropriate, that would not divest the court of jurisdiction to issue more focused relief to redress plaintiffs' own injuries. *See City of Chicago v. Barr*, 961 F.3d 882, 916 (7th Cir. 2020). Thus, it does not undermine plaintiffs' standing to challenge the ALPR program, at least as applied to them. *Cf. Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795, 803 (7th Cir. 2016).

U.S. 123 (1908). Plaintiffs seek to proceed under that doctrine. To do so, plaintiffs must show that "the named state officials are connected with the enforcement" of the allegedly unconstitutional statute, such that their "connection to the enforcement of the [challenged] statute is sufficiently intimate to meet the requirements of *Ex parte Young*." *Doe v. Holcomb*, 883 F.3d 971, 976–77 (7th Cir. 2018) (quotation omitted).

With respect to Governor Pritzker, plaintiffs allege that he "is responsible for enacting and implementing the surveillance policy challenged in this case," [1] ¶ 9, and has "ultimate authority" over the "policies and practices" of the Illinois State Police, [28] at 3. These nonspecific allegations do not pierce sovereign immunity. Plaintiffs do not specify Governor Pritzker's role in the enforcement of the Expressway Camera Act. Indeed, based on the allegations in the complaint, "the Governor was not specifically charged with a duty to enforce the" challenged statute, "and he has not taken on any duty to enforce it either." *Doe*, 883 F.3d at 976. "[T]he mere fact that a governor is under a general duty to enforce state laws does not make him a proper defendant in every action attacking the constitutionality of a state statute." *Id.* (quotation omitted). Absent specific allegations of Governor Pritzker's personal involvement in the enforcement of the challenge statute, plaintiffs cannot subject him to suit under *Ex parte Young. See Ill. League of Advocates for the Developmentally Disabled v. Quinn*, No. 13-CV-1300, 2013 WL 5548929, at *4 (N.D. Ill. Oct. 8, 2013) ("A theory of liability predicated on a governor's general obligations as the executive of the State cannot avoid the consequences of the Eleventh Amendment." (citations omitted)).

Turning to Attorney General Raoul, plaintiffs allege that he "is responsible for enforcing and defending the laws of the state of Illinois," [1] ¶ 10, and serves as "the chief law enforcement officer of the state responsible for overseeing the criminal investigations and prosecutions derived from this unconstitutional surveillance." [28] at 3. This nonspecific recitation of the Attorney General's job description does not pierce sovereign immunity. "Plaintiffs have not articulated any theory under which *Ex parte Young* supports a suit against the Attorney General, who has never threatened [them] with prosecution," and apparently "has no authority to do so." *Sherman v. Cmty. Consol. Sch. Dist. 21 of Wheeling Twp.*, 980 F.2d 437, 441 (7th Cir. 1992) (noting that "States' Attorneys, elected in each county, are the public prosecutors in Illinois"); *see also Whole Woman's Health v. Jackson*, 595 U.S. 30, 43 (2021) ("While *Ex parte Young* authorizes federal courts to enjoin certain state officials from enforcing state laws, the petitioners do not direct this Court to any enforcement authority the attorney general possesses in connection with [the challenged statute] that a federal court might enjoin him from exercising."). Because the complaint does not specify how Attorney General Raoul is personally involved in the enforcement of the Expressway Camera Act, he cannot be sued under § 1983.

Indeed, plaintiffs' attempt to sue Governor Pritzker and Attorney General Raoul under *Ex parte Young* is foreclosed by *Ex parte Young* itself. In that case, the Supreme Court explained:

8

>If, because they were law officers of the state, a case could be made for the purpose of testing the constitutionality of the statute, by an injunction suit brought against them, then the constitutionality of every act passed by the legislature could be tested by a suit against the governor and the attorney general, based upon the theory that the former, as the executive of the state, was, in a general sense, charged with the execution of all its laws, and the latter, as attorney general, might represent the state in litigation involving the enforcement of its statutes. That would be a very convenient way for obtaining a speedy judicial determination of questions of constitutional law which may be raised by individuals, but it is a mode which cannot be applied to the states of the Union consistently with the fundamental principle that they cannot, without their assent, be brought into any court at the suit of private persons.

>In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party.

209 U.S. at 157 (internal quotation marks omitted). Accordingly, Governor Pritzker and Attorney General Raoul are dismissed.

*Ex parte Young* extends only to official capacity suits against "state officials," *Malhotra v. Univ. of Ill. at Urbana-Champaign*, 77 F.4th 532, 536 n.3 (7th Cir. 2023), not to suits against "the State or one of its agencies or departments," *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) (explaining that sovereign immunity bars such suits "in the absence of [the State's] consent" to be sued). *See also P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) (explaining that *Ex parte Young* "has no application in suits against the States and their agencies"). Because the Illinois State Police is a department of the state of Illinois, and because it has not consented to this suit, it is dismissed.

Director Kelly does not invoke sovereign immunity. Indeed, he admitted at oral argument that this suit may proceed against him as the sole remaining defendant. Thus, the court proceeds to the merits of plaintiffs' Fourth Amendment challenge to the use of ALPRs.

## II.   Fourth Amendment

"The Fourth Amendment provides in relevant part that the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.'" *Collins v. Virginia*, 584 U.S. 586, 591 (2018). "[A]utomobiles are 'effects' and thus within the reach of the Fourth

Amendment." *South Dakota v. Opperman*, 428 U.S. 364, 367 (1976) (citation omitted). And "warrantless searches are presumptively unconstitutional." *Kyllo v. United States*, 533 U.S. 27, 32 (2001). However, "not all investigative actions are 'searches' subject to Fourth Amendment scrutiny." *United States v. Soybel*, 13 F.4th 584, 590 (7th Cir. 2021). Rather, "[t]he word 'search' is a term of art in Fourth Amendment analysis." *United States v. Shelton*, 997 F.3d 749, 758 n.2 (7th Cir. 2021).

"The Supreme Court has developed two distinct paths to identify a search[.]" *United States v. Tuggle*, 4 F.4th 505, 512 (7th Cir. 2021). First, "[u]nder the property-based approach, a search occurs when an officer enters a constitutionally protected area . . . for the purpose of gathering evidence against the property owner." *United States v. Lewis*, 38 F.4th 527, 533–34 (7th Cir. 2022) (citing *Florida v. Jardines*, 569 U.S. 1, 6 (2013)). "Alternatively, under the privacy-based approach, courts ask whether a person has a legitimate expectation of privacy in a given situation." *Id.* at 534 (citing *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)). Because plaintiffs do not argue that the ALPR program involves a physical intrusion on their property, the court will examine their Fourth Amendment challenge under the privacy-based approach.

"To determine whether someone has a legitimate expectation of privacy, courts must consider (1) whether that person, by his conduct, has exhibited an actual, subjective expectation of privacy and (2) whether his expectation of privacy is one that society is prepared to recognize as reasonable." *United States v. Sawyer*, 929 F.3d 497, 499 (7th Cir. 2019); *see California v. Ciraolo*, 476 U.S. 207, 211 (1986). Recognizing, however, that "constitutional rights are not generally defined by the subjective intent of those asserting the rights," the Supreme Court "has always emphasized the second of these two requirements." *Hudson v. Palmer*, 468 U.S. 517, 525 n.7 (1984); *see Tuggle*, 4 F.4th at 514.

The Fourth Amendment—as interpreted by *Katz* and its progeny—"limits the government's ability to exploit technological advances." *Lewis*, 38 F.4th at 534 (citing *Kyllo*, 533 U.S. at 34–35). But "[a]s long as the government moves discreetly with the times, its use of advanced technologies will likely not breach society's reconstituted (non)expectations of privacy." *Tuggle*, 4 F.4th at 510; *see also Kyllo*, 533 U.S. at 33–34 ("It would be foolish to contend that the degree of privacy secured to citizens by the Fourth Amendment has been entirely unaffected by the advance of technology.").

Applying these principles, the court concludes that, when an ALPR scans a license plate, it does not conduct a "search" and thus does not trigger Fourth Amendment scrutiny. *See Illinois v. Caballes*, 543 U.S. 405, 408 (2005) ("Official conduct that does not compromise any legitimate interest in privacy is not a search subject to the Fourth Amendment.").

First, "no privacy interest exists in license plates." *United States v. Walraven*, 892 F.2d 972, 974 (10th Cir. 1989); *see also United States v. Evans*, 27 F.3d 1219,

10

1228 (7th Cir. 1994). Indeed, the Supreme Court has "commented more than once on the diminished expectation of privacy in an automobile." *United States v. Knotts*, 460 U.S. 276, 281 (1983); *see, e.g., Opperman*, 428 U.S. at 367; *New York v. Class*, 475 U.S. 106, 112–13 (1986); *Cardwell v. Lewis*, 417 U.S. 583, 590 (1974) (plurality opinion); *see also United States v. Plancarte*, 105 F.4th 996, 1000 (7th Cir. 2024). That does not mean that "[a]n individual operating or traveling in an automobile . . . lose[s] all reasonable expectation of privacy." *Delaware v. Prouse*, 440 U.S. 648, 662 (1979); *accord Class*, 475 U.S. at 112 ("A citizen does not surrender all the protections of the Fourth Amendment by entering an automobile."). However, because "[t]he exterior of a car . . . is thrust into the public eye, . . . to examine it does not constitute a 'search.'" *Class*, 475 U.S. at 114.

"The factors that generally diminish the reasonable expectation of privacy in automobiles are applicable *a fortiori* to" license plates. *See id.* at 113. Illinois law requires vehicles to display two license plates—one on the front and one on the rear, both in a "position to be clearly visible" and "free from any materials that would obstruct the visibility of the plate." 625 ILCS 5/3-413(a); *see also Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 212 (2015) (explaining that "license plates are, essentially, government IDs"). And "it is unreasonable to have an expectation of privacy in an object required by law to be located in a place ordinarily in plain view from the exterior of the automobile." *Class*, 475 U.S. at 114.

Plaintiffs, of course, are concerned less with the license plates themselves and more with what the ALPR data reveals about their movements. But "[a] person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." *Knotts*, 460 U.S. at 281. "What a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection." *Katz*, 389 U.S. at 351. As *Knotts* observed, when a criminal suspect "travelled over the public streets he voluntarily conveyed to anyone who wanted to look the fact that he was travelling over particular roads in a particular direction, the fact of whatever stops he made, and the fact of his final destination when he exited from public roads onto private property." 460 U.S. at 281–82; *Cardwell*, 417 U.S. at 590 ("A car has little capacity for escaping public scrutiny. It travels public thoroughfares where its occupants and its contents are in plain view.").

*Knotts*, however, noted that "if such dragnet type law enforcement practices as respondent envisions should eventually occur, there will be time enough then to determine whether different constitutional principles may be applicable." 460 U.S. at 284; *see Carpenter v. United States*, 585 U.S. 296, 306 (2018) ("This Court in *Knotts*, however, was careful to distinguish between the rudimentary tracking facilitated by the beeper and more sweeping modes of surveillance."). Accordingly, plaintiffs argue that the ALPR program violates their "privacy interest in the *whole* of their physical movements." [15] at 4 (emphasis added); *see Carpenter*, 585 U.S. at 310 ("[I]ndividuals have a reasonable expectation of privacy in the whole of their physical movements.").

11

Plaintiffs' argument resembles the "mosaic" theory of the Fourth Amendment—"the idea that the 'government can learn more from a given slice of information if it can put that information in the context of a broader pattern, a mosaic.'" *United States v. House*, 120 F.4th 1313, 1318 (7th Cir. 2024) (quoting Matthew S. Kugler & Lior Jacob Strahilevitz, *Actual Expectations of Privacy, Fourth Amendment Doctrine, and the Mosaic Theory*, 2015 Sup. Ct. Rev. 205, 205 (2015)). In other words, the mosaic theory "asks 'whether a set of nonsearches aggregated together amount to a search because their collection and subsequent analysis creates a revealing mosaic.'" *Id.* at 1319 (quoting Orin S. Kerr, *The Mosaic Theory of the Fourth Amendment*, 111 Mich. L. Rev. 311, 320 (2012)). Under this theory, even if no single act of surveillance constitutes a search, the aggregation of information obtained through the surveillance program may nevertheless amount to a search. *See id.* ("[W]hile isolated pole camera surveillance would not offend the Fourth Amendment under the mosaic theory, surveillance that captures enough information to create a comprehensive account of a suspect's movements could."); *United States v. Maynard*, 615 F.3d 544, 562 (D.C. Cir. 2010) ("Prolonged surveillance reveals types of information not revealed by short-term surveillance, such as what a person does repeatedly, what he does not do, and what he does ensemble. These types of information can each reveal more about a person than does any individual trip viewed in isolation."), *aff'd sub nom. United States v. Jones*, 565 U.S. 400 (2012).

"Despite garnering passing endorsement from some—if not most—of the justices in the various opinions in *Jones, Riley* [*v. California*, 573 U.S. 373 (2014)], and *Carpenter*, the theory has not received the [Supreme] Court's full and affirmative adoption." *Tuggle*, 4 F.4th at 519–20; *see House*, 120 F.4th at 1319–20 ("[T]he mosaic theory has been discussed but not adopted by the Supreme Court."). And the Seventh Circuit has expressed skepticism about the theory. *See House*, 120 F.4th at 1319 (declining to apply the mosaic theory); *Tuggle*, 4 F.4th at 520 ("[M]any courts that have considered the theory have expressed disapproval . . . ." (footnote omitted)); *see also United States v. Cuevas-Perez*, 640 F.3d 272, 276–86 (7th Cir. 2011) (Flaum, J., concurring), *vacated*, 565 U.S. 1189 (2012). Rather than rely on abstract theories, the Seventh Circuit compares the challenged surveillance program to the surveillance methods tested in earlier cases. *See United States v. Hammond*, 996 F.3d 374, 389 (7th Cir. 2021) ("Given that *Carpenter* disclaimed providing any answer to the question before us, we consider whether the facts of this case are more similar to *Carpenter* or to *Knotts*."). The court will do the same.

The first relevant case is *Knotts*, 460 U.S. 276. As the Supreme Court later summarized:

In *United States v. Knotts*, law enforcement officials, with the consent of the seller, installed a beeper in a 5-gallon can of chloroform and monitored the beeper after delivery of the can to the buyer in Minneapolis, Minn. Although there was partial visual surveillance as the automobile containing the can moved along the public highways, the

12

> beeper enabled the officers to locate the can in the area of a cabin near Shell Lake, Wis., and it was this information that provided the basis for the issuance of a search warrant. . . . The Court held that since the movements of the automobile and the arrival of the can containing the beeper in the area of the cabin could have been observed by the naked eye, no Fourth Amendment violation was committed by monitoring the beeper during the trip to the cabin.

*United States v. Karo*, 468 U.S. 705, 713–14 (1984) (citation omitted).

In *Karo*, the Court distinguished *Knotts*, holding that warrantless "monitoring of a beeper in a private residence, a location not open to visual surveillance, violates the Fourth Amendment" because "the monitoring indicated that the beeper was inside the house," thus "reveal[ing] a critical fact about the interior of the premises that the Government is extremely interested in knowing and that it could not have otherwise obtained without a warrant." *Id.* at 714–15; *cf. Kyllo*, 533 U.S. at 34 ("We think that obtaining by sense-enhancing technology any information regarding the interior of the home that could not otherwise have been obtained without physical intrusion into a constitutionally protected area constitutes a search—at least where (as here) the technology in question is not in general public use." (citation omitted)).

Next is a line of cases addressing GPS tracking of vehicles. The key case is *Jones*, where the Supreme Court held "that the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search'" within the meaning of the Fourth Amendment. 565 U.S. at 404 (footnote omitted). The *Jones* majority relied on the property-based approach, not the *Katz* privacy-based approach. *See id.* at 404–11; *Carpenter*, 585 U.S. at 307 ("The Court decided the case based on the Government's physical trespass of the vehicle."). While the majority acknowledged that "[s]ituations involving merely the transmission of electronic signals without trespass would *remain* subject to *Katz* analysis," it declined to decide whether the challenged GPS monitoring was also a "search" under *Katz*. *Jones*, 565 U.S. at 406, 412, 411.

"Four concurring justices would have examined the case solely under" *Katz*. *United States v. Gutierrez*, 760 F.3d 750, 756 (7th Cir. 2014) (citing *Jones*, 565 U.S. at 419 (Alito, J., concurring in the judgment)). Writing for these justices, Justice Alito explained:

> Under [*Katz*], relatively short-term monitoring of a person's movements on public streets accords with expectations of privacy that our society has recognized as reasonable. But the use of longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy. For such offenses, society's expectation has been that law enforcement agents and others would not—and indeed, in the main, simply could not—secretly monitor and catalogue every single

movement of an individual's car for a very long period. In this case, for four weeks, law enforcement agents tracked every movement that respondent made in the vehicle he was driving. We need not identify with precision the point at which the tracking of this vehicle became a search, for the line was surely crossed before the 4-week mark. Other cases may present more difficult questions.

*Id.* at 430 (citation omitted).

Though joining the majority, Justice Sotomayor wrote separately to explain that she agreed with Justice Alito "that, at the very least, 'longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy.'" *Id.* at 415 (Sotomayor, J., concurring) (quoting *id.* at 430 (Alito, J., concurring in the judgment)). Thus, "five Justices agreed that longer term GPS monitoring of even a vehicle traveling on public streets constitutes a search." *Carpenter*, 585 U.S. at 314–15.[8]

That leads to the Supreme Court's landmark decision in *Carpenter*—the case on which plaintiffs' argument chiefly rests. In *Carpenter*, the Court considered "whether the Government conducts a search under the Fourth Amendment when it accesses historical cell phone records that provide a comprehensive chronicle of the user's past movements." 585 U.S. at 296. Invoking the Stored Communications Act, the Government obtained seven days of cell-site location information (CSLI) from Carpenter's wireless carrier. *Id.* at 310 n.3. CSLI "is the location information generated by a cell phone. When the phone is powered on, it sends and receives signals from the cell tower with the strongest signal; that cell tower is usually the

---

[8] Before *Jones*, the Seventh Circuit—relying principally on *Knotts*—held "that installation of a GPS device, and the use of the location data it produces, are not within the scope of the [F]ourth [A]mendment"—"no matter how long [the] tracking lasts." *United States v. Brown*, 744 F.3d 474, 476–477 (7th Cir. 2014); *see Cuevas-Perez*, 640 F.3d 272 (explaining that GPS tracking of a suspect for 60 hours is not a search under *Katz*); *United States v. Garcia,* 474 F.3d 994, 996–97 (7th Cir. 2007). *Knotts*, in turn, "addressed only the [*Katz* test], since the [property-based approach] was not at issue." *Jones*, 565 U.S. at 409. And the majority in "*Jones* did not hold . . . that monitoring a car's location for an extended time is a search even if . . . no property rights have been invaded." *Brown*, 744 F.3d at 476. Thus, holding that non-trespassory GPS tracking constitutes a search would require "an extension of *Jones*" that the Seventh Circuit has not yet embraced. *Id.*

It is thus unclear after *Jones* whether GPS monitoring invades a reasonable expectation of privacy. The Seventh Circuit's pre-*Jones* analyses may remain good law on the *Katz* question, even though *Jones* applied the property-based approach to reject their bottom-line conclusions. However, because a Supreme Court majority has since favorably cited the *Jones* concurrences, *see Carpenter*, 585 U.S. at 307, 309, 311–14, the court will assume for argument's sake that the GPS tracking in *Jones* invaded a reasonable expectation of privacy and was thus a "search" under *Katz*.

14

one closest to the phone." *United States v. Rosario*, 5 F.4th 706, 709 (7th Cir. 2021) (footnote omitted). The CSLI at issue in *Carpenter* included "an average of 101 data points per day." 585 U.S. at 302. The cell phone collected this data "by dint of its operation, without any affirmative act on the part of the user beyond powering up." *Id.* at 315. Though "[t]he precision of this information depends on the size of the geographic area covered by the cell site," the Court noted that CSLI was "rapidly approaching GPS-level precision." *Id.* at 301, 313.

The Court concluded that "when the Government accessed CSLI from the wireless carriers, it invaded Carpenter's reasonable expectation of privacy in the whole of his physical movements," and thus conducted a search under the Fourth Amendment. *Id.* at 313. As the Court explained, "[i]n light of the deeply revealing nature of CSLI, its depth, breadth, and comprehensive reach, and the inescapable and automatic nature of its collection . . . [t]he Government's acquisition of cell-site records here was a search under [the Fourth] Amendment." *Id.* at 320.

"[T]he Court in *Carpenter* stressed that its decision was a 'narrow one.'" *Soybel*, 13 F.4th at 592 (quoting *Carpenter*, 585 U.S. at 316); *Hammond*, 996 F.3d at 389 (describing *Carpenter*'s "holding" as "limited"). Consistent with that caveat, the Seventh Circuit has "suggested that *Carpenter* should be read narrowly" and "limited to the unique features of the historical CSLI at issue there." *Tuggle*, 4 F.4th at 325. On several occasions, the Seventh Circuit distinguished other surveillance technologies from the historical CSLI at issue in *Carpenter*. First, in *Hammond*, the court held that the government's access of *real-time* CSLI—as opposed to *historical* CSLI—did not constitute a search. 996 F.3d at 391–92. Next, in *Tuggle*, the court held that use of a pole camera to surveil the outside of a suspect's house for eighteen months did not constitute a search. 4 F.4th at 526. And in *House*, the court "reaffirm[ed]" the "holding in *Tuggle* that law enforcement's warrantless use of a pole camera to observe a home on a short- or long-term basis does not amount to a search under the Fourth Amendment." 120 F.4th at 1322. Finally, in *Soybel*, the court held that "the use of a pen register to identify IP addresses visited by a criminal suspect" is not a search. 13 F.4th at 587.

Plaintiffs, however, direct the court to the Fourth Circuit's decision in *Leaders of a Beautiful Struggle v. Baltimore Police Department*, 2 F.4th 330 (4th Cir. 2021) (en banc). In that case, the Fourth Circuit addressed a "first-of-its-kind aerial surveillance program" operated by the City of Baltimore. *Id.* at 333. The program "use[d] aerial photography to track movements related to serious crimes," with each individual image capturing "around 32 square miles" at a resolution that could "be magnified to a point where people and cars are individually visible, but only as blurred dots or blobs." *Id.* at 334. The court held that "*Carpenter* applie[d] squarely" because the program "'track[ed] every movement' of every person outside in Baltimore" and retained that data for at least 45 days. *Id.* at 341 (quoting *Carpenter*, 585 U.S. at 307).

Because none of these cases directly controls the use of the ALPR system, the court "consider[s] whether the facts of this case are more similar to" *Carpenter*, *Jones*, and *Leaders of a Beautiful Struggle* or to *Knotts*, *Hammond*, *Tuggle*, *House*, and *Soybel*, as well as "how the principles and expectations that animated those decisions play out in this case." *Hammond*, 996 F.3d at 389. The court concludes that the latter group of cases is more analogous, and thus Illinois's installation and use of the ALPR system is not a "search" subject to Fourth Amendment scrutiny.

Plaintiffs' reliance on *Carpenter* encounters an early roadblock: The "search" at issue there was "[t]he Government's *acquisition* of the cell-site records," not the third-party wireless carrier's initial collection of that data. *Carpenter*, 585 U.S. at 316 (emphasis added); *see Leaders of a Beautiful Struggle*, 2 F.4th at 344 ("*Carpenter* was clear on that issue: a search took place 'when the Government *accessed CSLI* from the wireless carriers." (quoting *Carpenter*, 585 U.S. at 313)). *Carpenter* did not have occasion to consider whether the initial collection of the CSLI data constituted a search because it was the wireless carriers, not the government, that collected the data. *See United States v. Adkinson*, 916 F.3d 605, 610 (7th Cir. 2019) (holding that the Fourth Amendment was not implicated where a wireless carrier collected and voluntarily shared CSLI with law enforcement). Similarly, the *Leaders of a Beautiful Struggle* court held that the search occurred when policed "access[ed]" the aerial surveillance data. 2 F.4th at 344. The government's accessing the data in *Carpenter* and *Leaders of a Beautiful Struggle* is analogous to Illinois's querying of the LEARN database, not to its collection of ALPR photos. But, as explained above, plaintiffs lack standing to challenge the use of the LEARN database. They can challenge only the collection of data—a practice neither *Carpenter* nor *Leaders of a Beautiful Struggle* addressed.

Even assuming that the *Carpenter* and *Leaders of a Beautiful Struggle* courts would have applied the same reasoning to the collection of data that they applied to the government's access of already-collected data, Illinois's ALPR program is distinguishable from those cases (and *Jones*) in important ways.

First, the ALPR program lacks the same "depth, breadth, and comprehensive reach" as the surveillance at issue in *Carpenter*, *Jones*, and *Leaders of a Beautiful Struggle*. *See Carpenter*, 585 U.S. at 320. The historical CSLI in *Carpenter* recorded an individual's location "several times a minute." *Id.* at 300. And the data came from a cell phone, which is "almost a 'feature of human anatomy'" and "tracks nearly exactly the movements of its owner." *Id.* at 311 (quoting *Riley*, 573 U.S. at 385). In *Leaders of a Beautiful Struggle*, the aerial surveillance tracked individuals anytime they were outside in Baltimore (so long as the system was turned on). *See* 2 F.4th at 345. By contrast, the ALPR program only tracks cars. As *Carpenter* observed, "individuals regularly leave their vehicles, [but] they compulsively carry cell phones with them all the time." 585 U.S. at 311. Accordingly, ALPRs do not allow police to "achieve[] near perfect surveillance." *Id.* at 312.

16

That makes *Jones* a closer analogue. But the surveillance here is also significantly less comprehensive than in *Jones*. A GPS tracking device follows a car wherever it goes. By contrast, the ALPR system records a vehicle's location only when it passes one of a limited (though expanding) number of ALPRs, each of which is installed near the roadside of an expressway. *See* [1] ¶¶ 14–16; *see also id.* ¶ 25. Thus, the ALPR system is more akin to the beeper in *Knotts*, which "amounted principally to the following of an automobile on public streets and highways," 460 U.S. at 281, or to the stationary pole cameras in *Tuggle,* 4 F.4th at 524, and *House*, 120 F.4th at 1322.

Because it is less comprehensive, the information recorded by the ALPR system lacks the same "deeply revealing nature" as the information recorded by the surveillance technologies discussed in *Carpenter*, *Jones*, and *Leaders of a Beautiful Struggle*. *See Carpenter*, 585 U.S. at 320. The utility of ALPRs for revealing an individual's "familial, political, professional, religious, and sexual associations," *id.* at 311 (quoting *Jones*, 565 U.S. at 415 (Sotomayor, J., concurring)), is sharply limited. Knowing what portions of an expressway someone passes tells the government far less about "the 'privacies of life,'" *Riley*, 573 U.S. at 403 (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)), than data that "tracks nearly exactly the movements of [a cellphone's] owner," *Carpenter*, 585 U.S. at 311. Unlike CSLI, ALPRs do not allow the government to "achieve[] near perfect surveillance, as if it had attached an ankle monitor" to someone. *Id.* at 312.

To be sure, the ALPR system shares some features that the *Carpenter* Court found important. Because license plate photos are generally stored in the LEARN database for 90 days, [1] ¶ 33; 605 ILCS 140/5, they have a "retrospective quality," allowing police to "travel back in time" and gain "access to a category of information otherwise unknowable" due to "a dearth of records and the frailties of recollection." *Carpenter*, 585 U.S. at 312; *see Leaders of a Beautiful Struggle*, 2 F.4th at 342; *Hammond*, 996 F.3d at 389 ("The *Carpenter* majority was particularly concerned with the 'retrospective quality' of the data that law enforcement collected . . . ."). And, like the surveillance methods at issue in *Carpenter* and *Leaders of a Beautiful Struggle*, ALPR data "runs against everyone"—or at least, against every driver on the specific expressways it covers—whether they have been implicated in a criminal investigation or not. *See Carpenter*, 585 U.S. at 312. For that reason, it shares some measure of the "inescapable and automatic nature" of the data collection in *Carpenter* and *Leaders of a Beautiful Struggle*. *See Carpenter*, 585 U.S. at 320.

But these considerations do not overcome the dramatically reduced scope of ALPR surveillance, relative to the surveillance techniques at issue in *Carpenter*, *Jones*, and *Leaders of a Beautiful Struggle*. That is especially so in light of the Seventh Circuit's instruction that "*Carpenter* should be read narrowly." *Tuggle*, 4 F.4th at 525.

17

In reaching this conclusion, the court joins the nearly uniform consensus of courts that have evaluated the constitutionality of ALPRs and held that their uses "were not Fourth Amendment searches requiring warrants or probable cause." *State v. Sidor*, 558 P.3d 621, 631 (Ariz. Ct. App. 2024) (collecting cases); *see, e.g.*, *United States v. Porter*, No. 21-cr-00087, 2022 WL 124563 (N.D. Ill. Jan. 13, 2022); *United States v. Brown*, No. 19-cr-00949, 2021 WL 4963602 (N.D. Ill. Oct. 26, 2021); *United States v. Toombs*, 671 F. Supp. 3d 1329 (N.D. Ala. 2023); *Commonwealth v. McCarthy*, 142 N.E.3d 1090 (Mass. 2020); *Sidor*, 558 P.3d at 629. *But see Schmidt v. City of Norfolk*, No. 2:24-cv-621, 2025 WL 410080 (E.D. Va. Feb. 5, 2025); *Commonwealth v. Bell*, 113 Va. Cir. 316 (Va. Cir. Ct. 2024).

The court does not decide whether a more extensive network of ALPRs might infringe a reasonable expectation of privacy under *Katz*. For now, it is enough to conclude that Illinois's current ALPR system is not sufficiently akin to "'attach[ing] an ankle monitor' to every person in" Illinois. *Leaders of a Beautiful Struggle*, 2 F.4th at 341 (alteration in original) (quoting *Carpenter*, 585 U.S. at 312). As *Katz* itself made clear, "[w]hat a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection." 389 U.S. at 351. Thus, as a general matter, "[a] person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." *Knotts*, 460 U.S. at 281. To be sure, "individuals have a reasonable expectation of privacy in the *whole* of their physical movements." *Carpenter*, 585 U.S. at 310 (emphasis added). But, for the reasons discussed, Illinois's use of ALPRs, as alleged in the complaint, is not so intrusive as to invade that expectation. It is not a search under the Fourth Amendment.

## CONCLUSION

Defendants' motion to dismiss, [22], is granted. Because plaintiffs fail to state a claim, they have not demonstrated that they are likely to succeed on the merits. *See Braam v. Carr*, 37 F.4th 1269, 1272 (7th Cir. 2022) ("The first step in the [preliminary injunction] analysis—the plaintiff's likelihood of success on the merits—is often decisive."). Thus, plaintiff's motion for a preliminary injunction, [14], is denied.

Plaintiffs are given until April 30, 2025, to file a motion for leave to amend, if they wish to do so and believe they can do so consistent with this opinion and Rule 11. A copy of the proposed amended complaint indicating what changes the amended complaint makes to the original complaint must be attached to the motion. If no motion is filed by April 30, 2025, the court will enter final judgment and terminate this case.

Dated: March 31, 2025                  /s/ Martha M. Pacold