```
 1                 IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3   STEPHANIE SCHOLL and FRANK      )  Case No. 24 C 4435
     BEDNARZ,                        )
 4                                   )
                      Plaintiffs,    )
 5            v.                     )
                                     )
 6   ILLINOIS STATE POLICE, et       )
     al.,                            )  Chicago, Illinois
 7                                   )  December 12, 2024
                      Defendants.    )  1:06 p.m.
 8
                    TRANSCRIPT OF PROCEEDINGS - MOTION
 9           BEFORE THE HONORABLE MARTHA M. PACOLD

10   APPEARANCES:

11   For the Plaintiffs:     LIBERTY JUSTICE CENTER
                             BY:  MR. REILLY W. STEPHENS
12                           7500 Rialto Blvd., Suite 1-250
                             Austin, Texas 78735
13
     For the Defendants:     ILLINOIS ATTORNEY GENERAL'S OFFICE
14                           GENERAL LAW
                             BY:  MS. MARY A. JOHNSTON
15                           115 S. LaSalle Street
                             Chicago, IL 60603
16

17

18

19

20   Court Reporter:         KATHLEEN M. FENNELL, CSR, RMR, FCRR
                             Official Court Reporter
21                           219 South Dearborn Street, Room 2328A
                             Chicago, Illinois  60604
22                           Telephone:  (312) 435-5569
                             Kathleen_Fennell@ilnd.uscourts.gov
23
                           *   *   *   *   *
24
                    PROCEEDINGS REPORTED BY STENOTYPE
25        TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION
```

1        (Proceedings heard in open court:)

2        (Call to order.)

3              THE CLERK:  24 C 4435, Scholl v. Illinois State

4   Police.  Everyone else can be seated, and plaintiff can state

5   your name.

6              Plaintiff can state your name, start with plaintiff.

7              Who's plaintiff?

8              MR. STEPHENS:  Oh, Reilly Stephens for the plaintiff,

9   Your Honor.

10             THE CLERK:  And defendants?

11             MS. JOHNSTON:  Assistant Attorney General Mary

12  Johnston on behalf of defendants.

13             THE COURT:  Good afternoon, everyone.

14             We're here for the argument on the pending motions.

15  There's a motion by the plaintiffs for a preliminary

16  injunction, and then there's a motion to dismiss by the

17  defense.

18             Are the parties ready to proceed with the argument?

19             MS. JOHNSTON:  Yes.

20             MR. STEPHENS:  Yes.

21             MS. JOHNSTON:  Yes, Your Honor, we can step up.

22             THE COURT:  Okay.

23             Well, okay, so let's just talk quickly about what's

24  going to be the order.  Did you have a chance to discuss that

25  at all?

1    MR. STEPHENS:  We have not talked about that, I don't

2  think.

3    MS. JOHNSTON:  We have not.  I would suggest possibly

4  proceeding in the same order of the briefing.  So we could have

5  plaintiff --

6    MR. STEPHENS:  That's me then.

7    MS. JOHNSTON:  Yeah, plaintiff opening, then

8  defendants, back to plaintiff, and then ending with defendants

9  again, sort of mimicking what it is that was filed.

10    MR. STEPHENS:  That's fine with me if it's fine with

11  you, Your Honor.

12    THE COURT:  Okay.  That sounds good.  I think that

13  makes sense just to track the order of the briefs.

14    And I believe I set a 30-minute time limit.  I mean,

15  if you think you need more time than that, you know, I would

16  understand, but I mean just approximately that would be good.

17    MS. JOHNSTON:  Should I step up?

18    THE COURT:  Okay.  Whenever you're ready.

19    Actually, also, I think since it could be up to

20  30 minutes or around there, if you'd like to stay seated while

21  the other side is arguing.

22    MR. STEPHENS:  I'm not going to take 30 minutes unless

23  Your Honor has questions.

24    THE COURT:  Okay.

25    MR. STEPHENS:  I don't think I have 30 minutes of

1  extemporaneous things to say, so it's up to Your Honor.

2         MS. JOHNSTON:  I also think it's unlikely.  I'll step

3  up, but thank you, Your Honor, I appreciate that.

4         THE COURT:  All right.

5         MR. STEPHENS:  All right.  Everybody ready?

6         THE COURT:  Yes, whenever you're ready.

7         MR. STEPHENS:  Okay.  May it please the Court, Reilly

8  Stephens on behalf of the plaintiffs.

9         Your Honor, the defendants are tracking every citizen

10  without probable cause, without reasonable suspicion, without

11  even unreasonable suspicion, without any suspicion at all.

12  Rather, they treat every citizen as the proper subject of

13  surveillance only to decide later who to check up on.

14         In defense of this, they fall back on essentially

15  20th century case law about beepers and pagers and pay phones,

16  but as the past decade-plus of Supreme Court precedence has

17  shown and explained, modern technology is different because the

18  marginal costs of surveillance have been so thoroughly reduced,

19  which is why cases like *Jones* and *Riley* and ultimately most

20  importantly *Carpenter* found that the aggregation of data

21  allowed by modern technology makes things different in kind,

22  not simply different in quantity, right?

23         And that reduction in marginal cost means that what

24  used to require the police to put a tail on somebody, to put a

25  body on somebody, to actually put resources in, now they can

1    sit passively and let the computer collect all the data on all

2    of us and decide later who to target and, again, without a

3    warrant, without any kind of probable cause, without any kind

4    of court review, without any kind of magistrate, without any

5    kind of committee, as far as I'm aware, or any kind of

6    oversight.  The police simply can look at and figure out where

7    you're going, where anybody is going based on their claim of a

8    legitimate law enforcement purpose.

9         And we simply submit that the Fourth Amendment

10    requires more.  We think at the minimum, they shouldn't be

11    allowed to collect and store data on everybody, but at minimum

12    they should have to get a warrant, when -- go through some sort

13    of process in order to surveil us all in this manner.

14         In many ways, this is, in fact, worse than *Carpenter*

15    because in *Carpenter,* the government had to get a subpoena, had

16    to go to Verizon with a subpoena and get it from the phone

17    company.  Here, the government just has the data.  They don't

18    need a subpoena.  They don't need any kind of process.

19         A subpoena, the company can actually challenge and say

20    we don't think that our customers should be -- have their data

21    turned over.  There's no such check in here.  It's simply up to

22    the discretion and good faith of the police officers, and while

23    most police officers we may trust, we certainly understand that

24    we have the Fourth Amendment, we have warrant requirements

25    because we understand that there needs to be oversight.

1           As the Fourth Circuit explained in the *Leaders of a*

2 *Beautiful Struggle* case --

3           THE COURT REPORTER:  Leaders of --

4           MR. STEPHENS:  Leaders of a Beautiful Struggle, it's

5 like a nonprofit that was the party in that case.

6           THE COURT REPORTER:  I just didn't understand you.

7           MR. STEPHENS:  I'm sorry.  *Leaders of a Beautiful*

8 *Struggle v. City of Baltimore*, I believe it is, or Baltimore

9 Police maybe.

10           That, you know, this kind of collection is where

11 everyone's driving at every point, it is different in kind than

12 an individual data point or an individual moment.  It is rather

13 that it shows -- it reveals that the habits of our lives, what

14 we do repeatedly, where we go, and where we don't go, and it

15 paints a picture of how we live that isn't painted by a single

16 camera outside of a single public space, as in the Seventh

17 Circuit case in *Tuggle*.

18           Illinois knows that this is a problem.  They

19 understand this on some level because they actually passed this

20 past year a limitation specifically that this data will not be

21 shared with other states for purposes of abortion and

22 immigration enforcement.  Those things that they realize this

23 data is dangerous for, we submit this data is dangerous in a

24 lot of other ways, and we submit that because of that, there

25 should be a process and there should be a limitation on the

1  government's ability to track every citizen wherever they go

2  for all purposes.

3       I don't want to just reiterate the rest of what's in

4  the brief.  I think Your Honor can read that for yourself.  I

5  think -- I would just say there's a few points.

6       Their standing argument I think pretty much is a

7  merits argument, so I don't know what to say about that other

8  than that, you know, this is a search, and we can talk about

9  that, I would talk about it more in the context of the Fourth

10 Amendment analysis of this is a search because there's a

11 reasonable expectation of privacy which *Carpenter* establishes

12 in public movements.

13      On their sovereign immunity thing, the first thing to

14 say is that it's kind of academic because they didn't even

15 raise sovereign immunity as to Director Kelly, and so this case

16 cannot be dismissed on those grounds even if you disagree with

17 me that I think the Governor and the Attorney General are

18 rightfully in this case and can rightfully be enjoined under *ex

19 parte Young* for the behavior of their subordinates and the

20 programs that they oversee.

21      And, again, the Seventh Circuit has made clear that it

22 is perfectly acceptable for this Court to issue, really I think

23 it was broader than just the two plaintiffs in this case in a

24 situation like this, and we think this situation fits that

25 criteria.

1      But just I guess the last thing is specifically on the

2  Governor, I do think he stays in the case because I do think

3  that as the Seventh Circuit explained in *Holcomb*, you know,

4  his -- that place was simply pled incorrectly.  It was pled as

5  an injunction against the Governor to do something rather than

6  an injunction of the Governor as the head of the Bureau of

7  Motor Vehicles of Indiana, right, and so that I think

8  distinguishes that.

9      And that was kind of my affirmative presentation, Your

10  Honor.  I don't know if you had any questions.

11      THE COURT:  I do have a few questions.  I guess I'm

12  trying to think through whether to ask these now or wait until

13  both of you have made your presentations and then ask them --

14      MR. STEPHENS:  At the Court's preference.

15      THE COURT:  -- of both sides.

16      Okay.  Maybe I'll do that.  So we'll go next to the

17  defense, and then because it's possible that some of the

18  questions get answered as you both are completing the rest of

19  the arguments and maybe I just ask at the end.

20      MR. STEPHENS:  Okay.

21      THE COURT:  Okay.

22      MS. JOHNSTON:  Understood.

23      Thank you, Your Honor.  Again, Mary Johnston on behalf

24  of the defendants.

25      So I'm going to change the order a little bit in which

1  I address these points, and I'm just going to start off with

2  the Eleventh Amendment argument.  Plaintiff is correct that

3  defendants did not raise an Eleventh Amendment argument as to

4  Director Kelly, and that's because we agree that -- well,

5  obviously there's disagreement about the merits of the

6  underlying claim.  We agree that if it does move forward,

7  Director Kelly is the appropriate defendant.

8       Plaintiffs' response or reply, if you will, does seem

9  to concede that the Illinois State Police as an entity is not

10  an appropriate defendant because it's not a person for purposes

11  of Section 1983 litigation, so we would ask that the Illinois

12  State Police certainly be dismissed.

13       Plaintiffs' argument as to Governor Pritzker is also

14  misplaced.  As explained in the briefing and just now, that

15  argument really relies on the idea that Governor Pritzker is

16  directly involved in the operation of the Tamara Clayton

17  Expressway Act, or the relevant act at issue here, simply

18  because of his role as Governor of the State of Illinois and

19  because he appointed Director Kelly, and this somehow gives him

20  some specific involvement here.

21       But that actually stands really in contrast to the

22  ruling of *ex parte Young* because if this rationale were

23  accepted, it would mean that the Governor would be a proper

24  defendant any time any statute was challenged simply by virtue

25  of being the Governor, and the case law is clear that there

1   does need to be more than him fulfilling the basic obligations

2   of his role in order to get around the Eleventh Amendment.

3          So because there is no special relationship between

4   the Governor and his actions and the Act, the Eleventh

5   Amendment does bar those claims.

6          Turning finally then to Attorney General Raoul, those

7   claims are also barred by the Eleventh Amendment.  I don't

8   believe that this was addressed in argument right now, but the

9   Attorney General has the ability to use data that's pulled from

10  ALPRs to prosecute crimes.

11         There's no other involvement with the Act.  If the

12  Act -- you know, if the data wasn't available, he would still

13  be able to prosecute those crimes in other manners, and

14  because, again, there isn't just special relationship between

15  Attorney General Raoul and the Act, those claims are also

16  barred by the Eleventh Amendment.

17         So we'd like to reiterate that the Illinois State

18  Police, Governor Pritzker, and Attorney General Raoul should be

19  dismissed as defendants with the only remaining defendant being

20  defendant Director Kelly should the claims move forward.

21         Then moving on to more of the merits of plaintiffs'

22  claims, which we agree actually really kind of encompass

23  standing as well.  As a preliminary point, it is plaintiffs'

24  burden to establish that they have standing to bring their

25  claims, and here that allegation relates solely to whether or

1   not the use of ALPRs themselves has created any sort of

2   cognizable injury.

3          Plaintiffs admit that they have not had ALPR data used

4   against them.  They admit that there's no real reason to

5   believe that it will be used against them in the future.  As

6   such, the entire theory of the case rests on whether the use of

7   ALPRs in general is constitutional.  And because that's the

8   argument, this is a situation where standing and the merits

9   can't really be unraveled because the success of plaintiffs'

10  claim or, as we assert here, the failure of plaintiffs' claim

11  kind of rises and falls with the Fourth Amendment analysis,

12  meaning that if this case -- if this Court finds that there's

13  no Fourth Amendment violation, then there's also no standing.

14         Either way, defendants do note that this is

15  plaintiffs' burden, and it's notable that they have not cited

16  to any sort of case law or applicable comparison to support

17  their theory of why the use of ALPRs in and of themselves is a

18  cognizable injury.

19         Instead, you know, we have some inapplicable

20  hypotheticals in the response/reply, which is -- let me just

21  clarify that is -- I think that's ECF number -- I apologize,

22  Your Honor.  I just wanted to clarify which one.  ECF No. 28.

23         You know, they make reference to how, if the State of

24  Illinois installed cameras in the master bedroom of every home,

25  they would be able to challenge that even though that data

1   hadn't been used against them in any way.

2        But the comparison first of all, specifically ignores

3   the fact that the Fourth Amendment extends directly to an

4   individual's privacy in their home, and this analogy really

5   kind of highlights how thin the argument is, and the obvious

6   difference between activities that take place in our homes and

7   the activities that take place in our vehicles on public roads.

8        All in all, it amounts to little more than kind of a

9   general and idealogical disagreement with state action, which

10  is not in and of itself a constitutional violation.  There

11  needs to be more.

12       And so turning then to the kind of substance of the

13  Fourth Amendment claim, that fails as well.  I want to very,

14  very briefly just direct the Court to two points regarding the

15  Fourth Amendment claims before moving into more of the meat of

16  it.

17       The first relates to plaintiffs' facial challenge.

18  This is described in depth in the briefing, but generally

19  speaking, in order for a facial challenge to succeed, the

20  plaintiff has to show that there is no situation in which it

21  can be constitutional.

22       Here, that simply isn't the case.  Plaintiffs' own

23  example about, you know, being able to use ALPRs to locate a

24  missing person or a kidnapped individual shows why it is that

25  there are constitutional uses to this.  I mean, that could be

1　looking at historical data that goes back, you know, hours,

2　days, weeks, to assist law enforcement for constitutional

3　purposes.

4　　　　　And then it's also important to clarify exactly what

5　conduct is challenged here.  Plaintiffs' complaint and

6　allegations relate to the Tamara Clayton Expressway Act as

7　operated by the Illinois State Police.  Now, plaintiffs'

8　response or reply makes some statements about information from

9　other towns or municipalities.  That's not what's at issue

10　here.

11　　　　　This lawsuit is limited to the use of the ALPRs as

12　designated by the Act which are located on certain highways and

13　expressways throughout the state.  There can't be general

14　statements about what type of data would be available from

15　other cameras that might exist.  Any of those allegations

16　shouldn't be able to be used to kind of bolster plaintiffs'

17　argument to go on a fishing expedition.

18　　　　　Then moving on to the substance of the Fourth

19　Amendment claim and the as-applied challenge, the main question

20　is whether or not a person has a reasonable expectation of

21　privacy in the information that they voluntarily display in

22　public.  So that could be the license plate number or their

23　location on public roads, and the case law is clear that this

24　is simply not the case.

25　　　　　You know, it is true that there have been advances in

1    technology and that physical trespass isn't always required for

2    there to be a Fourth Amendment violation, but in these

3    situations, the Supreme Court has made it abundantly clear that

4    when evaluating situations like that, you look to the two-part

5    analysis from *Katz*, and so that acts if there's a subjective

6    expectation of privacy and then it looks at whether or not the

7    government infringed on an expectation of privacy that society

8    considers reasonable.

9         And that's the test that controls here, and the real

10   issue in this case is whether or not the use of ALPRs infringes

11   on an expectation of privacy that society considers reasonable.

12        Plaintiff made statements about how defendants rely on

13   old case law, but first of all, that simply isn't the case, and

14   *Tuggle* is very instructive here.  *Tuggle* is a case from the

15   Seventh Circuit -- I apologize, let me get the date -- from

16   2021, and it was reaffirmed as recently as six weeks ago by the

17   Seventh Circuit in *United States v. House*.

18        In *Tuggle*, the court upheld the use of pole cameras to

19   capture the front door of the defendant's home for 18 months.

20   The Seventh Circuit held that this didn't constitute a search

21   and stated that the government's use of technology in public

22   use, while occupying a place it was lawfully enabled to be, to

23   observe plaintiff's visible happenings does not run afoul of

24   the Fourth Amendment, and that's the rationale that applies

25   here.

1    There are cases that show that there is no expectation

2    of privacy in your license plate number because that's publicly

3    displayed as required by law every time that you're driving.

4    That was discussed by the Seventh Circuit in *United States v.*

5    *Miranda-Sotolongo* and also by the Supreme Court, I believe it's

6    *New York v. Class*.

7    Moreover, the law from the *United States v. Knotts,*

8    which explained that there's no expectation in privacy on

9    public streets, is still good law.  There's a portion of

10   plaintiffs' response or reply brief where they attempt to

11   distinguish this from the later case of *United States v. Jones*,

12   but as explained in more detail in the briefing, *Jones* in no

13   way overruled *Knotts*, and certainly not the holding that there

14   isn't an expectation of privacy in your movement on a public

15   road.

16   And then plaintiffs also spent a significant amount of

17   time focusing on this aggregate data theory that was presented

18   in the *Carpenter* and the *Leaders of a Beautiful Struggle* cases.

19   But if you look at the type of data that was available in those

20   cases and compare it with the data that's available here, they

21   are not comparable.

22   You know, *Carpenter* was looking at the historic

23   culling of cellphone data, and *Leaders of a Beautiful Struggle*

24   had a much more expansive kind of surveillance system that

25   included drones throughout the City of Baltimore, and the

1    courts in those cases specifically noted how using that type of

2    data allowed the government to be able to recreate kind of the

3    whole of an individual's movements.  I believe it was the

4    *Leaders of a Beautiful Struggle* case that equated it to almost

5    having an ankle monitor on the individuals.  And looking at

6    what's alleged here, that simply isn't the case.

7            Again, these are cameras that capture license plate

8    data on highways and expressways.  It's simply unreasonable to

9    conclude that that means that you could really recreate any,

10   let alone the whole, of an individual's movements.

11           It doesn't show information about, you know, what

12   businesses somebody's going to, whose homes they're visiting,

13   what doctors' offices, lawyers, religious institutions, or

14   really any location that they're actually ending up at.

15           As such, you know, this idea that these ALPRs are

16   creating this dragnet surveillance system, as plaintiffs claim,

17   is really just well beyond the idea of what is plausible based

18   on the allegations in the complaint.

19           Moreover, defendants want to note that plaintiff has

20   ignored that there are cases from this circuit specifically

21   holding that ALPRs do not violate the Fourth Amendment.

22   Specifically, that was *United States v. Brown* and *United States*

23   *v. Porter*.

24           And those cases, when reaching that conclusion that

25   ALPR data simply did not amount to the level of kind of

1    surveillance that was at issue in *Carpenter*, *Leaders of a*
2    *Beautiful Struggle*, actually specifically addressed *Carpenter*
3    and found that ALPRs are constitutional.

4         So overall, this amounts to a case where the
5    plaintiffs are unhappy with a state statute.  But unhappiness
6    and disagreement with a law does not render the law
7    unconstitutional, and it's well-established that the use of
8    ALPRs falls squarely within the confines of the Fourth
9    Amendment, and, as such, plaintiffs' claims ultimately fail and
10   should be dismissed.

11        And then just to briefly touch on the other factors
12   present that would need to be met should plaintiff be entitled
13   to a preliminary injunction, you know, those factors also show
14   why it is that a preliminary injunction is not appropriate
15   here.

16        Again, the first question that the courts look at is
17   the likelihood of success on the merits, and as I've just
18   explained and as is discussed at length in the briefing, it is
19   defendants' position that plaintiffs cannot succeed on the
20   merits of their claims and that those claims should be
21   dismissed.  But either way, plaintiffs also have not been able
22   to show that they've suffered any sort of irreparable harm that
23   would warrant kind of the extreme measure that is a preliminary
24   injunction.

25        As pointed out in the briefing, plaintiffs waited

1  several years to file this lawsuit, and we'll concede that a

2  delay is not always -- you know, a delay isn't definitive proof

3  that there isn't irreparable harm, but plaintiffs' own

4  statements that they didn't file sooner partially because they

5  weren't even aware of the law certainly undercuts the idea that

6  this is such urgency that a preliminary injunction enjoining

7  ISP from, you know, enforcing the law as written is warranted.

8          And then, moreover, the balance of harms here would

9  tip decidedly in the State's favor.  As explained in the

10  briefing, when the State is the defendant, the public interest,

11  and, you know, the State's interests kind of merge, and not

12  only is it in general a significant burden to enjoin a state

13  from enforcing its own laws, that's particularly present here,

14  given that this is a statute that's designed specifically to

15  promote public safety.

16          So any sort of injunction would be a significant

17  burden to the public interest, and that, balanced with the fact

18  that the plaintiffs haven't succeeded on stating a viable

19  Fourth Amendment claim in the first place, shows that an

20  injunction is certainly not proper in this situation.

21          As such, defendants would request that this Court both

22  deny plaintiffs' motion for preliminary injunction and dismiss

23  plaintiffs' complaint.

24          THE COURT:  Okay.  Thanks.

25          I'll come back to plaintiff then.

1    MR. STEPHENS:  Sure, Your Honor.  I just -- a few

2  things in response.

3    On the Eleventh Amendment, I don't want to spend too

4  much time on it because I -- ultimately Director Kelly is still

5  in the case, and so we're moving forward with the case either

6  way.

7    I would stand on what we said in the briefs about the

8  Governor and Attorney General.  And if you disagree with us,

9  that's actually fine because Director Kelly is still in the

10  case.  I still think they are proper parties.  I don't know --

11  I honestly don't why the State cares so much because it's kind

12  of symbolic.

13    To be clear, she said we're just causing the use --

14  we're saying the use of ALPRs, we're actually not challenging

15  the use, we're challenging the storing of the information, if

16  that makes sense.  It's a bit different just to clarify that.

17  Just because we haven't cited case law about ALPRS, there isn't

18  much appellate case law.  We have cited to everything I found

19  just because this technology is very new, and *Carpenter* is

20  relatively new.  It's only about six years old, so there isn't

21  a ton of case law.

22    The cases -- the couple case -- mostly the cases that

23  have dealt with this are suppression motions in a criminal --

24  particular criminal prosecution of a particular individual

25  dealing with one or two cameras for the most part.

1        Now, the case we have cited which I think is most

2    analogous is the Fourth Circuit case and is *Carpenter* itself.

3    I don't -- I wouldn't -- I don't really know what she means by

4    an ideological objection to the statute.  I mean, I think our

5    objection is an objection that is based in the privacy concerns

6    of the Fourth Amendment, and I don't -- I'm not even sure

7    that's an ideological point.

8        It's not a left or a right or any kind of thing like

9    that.  It's a concern about privacy, and we can agree to

10   disagree about how to set the standards for privacy, but it's

11   -- you know, it seems like a very straightforward legal

12   argument about what the scope of the Fourth Amendment should

13   be.

14       On -- on the point about the other jurisdictions,

15   they're relevant because ISP has access to that data, right,

16   and so ISP can use that data just like they can use the data

17   they're collecting from their own cameras.

18       So while our lawsuit here is focused on them, we sued

19   them because we had to start somewhere, and I submit that the

20   fact that some other jurisdiction or some other agency might be

21   violating the Constitution is not a defense of ISP's violating

22   it.

23       And so that -- but that subject is relevant because

24   ISP has it and they can use that data through data sharing, as

25   well as sharing their data with those other jurisdictions.

1          On the *Katz* point, I think *Carpenter* establishes the

2     reasonable expectation of privacy that society is going to

3     recognize.  The Supreme Court recognized it in *Carpenter*.  It's

4     the expectation of privacy in your physical movements, and it's

5     in the aggregation of your physical movements, the whole of

6     your physical movements, which is what makes it different from

7     the other earlier cases we were talking about.

8          *Tuggle* is a good example because in *Tuggle*, again, you

9     have -- I think it's three cameras that are pointing at the

10    same house, if I remember right, but it's the same house.  It's

11    one location over an extended period of time.  It's the same

12    kind of data you could have collected had you put a police

13    officer on the roof across the street and had him watching that

14    one spot, right, and so the fact -- and so that's not what

15    *Carpenter* is concerned with, right?

16          *Carpenter* is not concerned with a single location of

17    the man's cellphone.  *Carpenter* is concerned with the fact that

18    they got months of his cellphone data in order to track his

19    whereabouts to show that he was in the vicinity of these -- I

20    think they were Radio Shack stores or T-Mobile stores.  They

21    were, like, cellphone stores ironically enough that he was

22    robbing.

23          And so that is the *Carpenter* point.  The cases she's

24    talking about license plates are -- they're a cop -- they're

25    generally a cop pulls someone over and runs a plate.  You know,

1   they've had someone reason to pull someone over.  They run the

2   plate.  They find out there's a warrant, et cetera, and it's

3   certainly about, like, the good faith of the police officer.

4   It's not about the collection, aggregation of people's cars and

5   everywhere they're going and the car as a stand-in for the

6   person as a way of tracking the person's movement.  It's just a

7   -- they're dealing with a different kind of situation.

8           The *Leaders of the Beautiful Struggle* case I think is

9   more on point  -- she said was multiple drones by memory.

10  Maybe she's right.  I thought it was one plane that was flying

11  around the city, but in any case, it was a camera that was

12  hundreds of feet in the air, and so it's just following these

13  blocks, right?  And so the kind of -- I think with *Carpenter*

14  and with this and with the Fourth Circuit case, you're looking

15  at different kind of -- different sorts is -- they had

16  different kind of resolutions, right?

17          In some ways, *Carpenter* is higher resolution because

18  people carry their cellphones maybe more than in their car, but

19  on the other hand, the camera takes a picture of your exact

20  location, whereas the cellphone is -- location is an

21  approximate, it's sort of a triangulation, right, and the

22  camera is taking a picture of you, right?

23          And so in the Fourth Circuit case, they have in some

24  ways a more full picture of the city because basically they're

25  taking a big picture of the city and seeing every car drive

1   around it is basically what they're doing.  So instead of

2   having multiple cameras, driving one big camera and recording

3   that way.  That's the difference in the two cases.

4        And so we think that the same principle applies here

5   as there because we don't think -- we think it's a mistake to

6   say, well, once people got out of their car, we're not

7   following them anymore.  The question is are you following them

8   enough.

9        When people got out of their cars in Baltimore, they

10  were -- they could escape the surveillance maybe, but that was

11  still enough -- still enough they were tracking people from a

12  distance without any specificity to be able to identify the

13  people.  They could just see the blue car going up Main Street,

14  right?

15       And, you know, in *Carpenter*, people leave their

16  cellphones at home, some people go off the grid for days.

17  There are times when you don't have your cellphone either,

18  right?  And so -- and, oh, cellphone you can give your

19  cellphone -- my wife will borrow my cellphone occasionally if

20  she needs something, right?  So there's all sorts of -- it's

21  not that *Carpenter* requires a perfect picture of everything.

22  That's not what it's talking about.  It's talking about a

23  sufficient aggregation of a sufficient picture of our

24  movements.

25       And so we would submit that, yes, this is like having

1   an ankle monitor.  It's just a matter of how often the ankle

2   monitor is turned on.

3         On this point about us waiting years, I mean, I'll

4   just tell you my clients just weren't aware that the State was

5   doing this.  I don't know why it matters that they didn't find

6   out until a couple years after it was passed.  They don't seem

7   to be making any kind of statute of limitations argument, and I

8   don't -- so I don't really know what import it is.

9         I mean, I think -- it's not -- it is urgent in the

10  sense that this is harm that's happening every day, but it is

11  not the kind of thing where we thought we should move for any

12  kind of emergency or anything, and so we've tried to do this

13  under normal procedures as we litigated the case, and I don't

14  think that's a bad thing.  So I don't really know what the

15  delay says either way.

16        Those were -- those were the things I had noted.

17        THE COURT:  Okay, thank you.

18        And I guess we were going to come back to the defense.

19        MS. JOHNSTON:  Thank you.  Yes, just a couple quick

20  points.

21        One is to clarify just kind of a term here.  I -- when

22  I have been using the term usage of ALPRs or the use of the

23  ALPRs, I've meant the storage of the data as well as, you know,

24  the actual moment that it captures the data.

25        So just to clarify, we are encompassing both of those

1   kind of concepts in the term of using ALPRs because that is how

2   it is that they're operating right now.

3          I would like to point out that, once again, any

4   statements about what it is that's going on in other

5   jurisdictions or other towns are doing with any sort of camera

6   program, if you will, is not what's at issue in this lawsuit.

7   This lawsuit only relates to this specific Act as operated by

8   the Illinois State Police.  Nothing else is at issue here.

9          And then to kind of address some of plaintiffs' points

10  about the scope of what is being captured and the invasiveness

11  of the ALPRs and the other cases that plaintiff cited to, it's

12  just well-established, and as discussed in *Brown* and *Porter*

13  that this program simply does not create that ability to

14  recreate and trace an individual's movement that was at issue

15  at *Carpenter* or *Leaders of a Beautiful Struggle*.

16         Again, these are cameras located on highways and

17  expressways.  They are not providing the full comprehensive

18  picture that plaintiffs kind of allege they are.  This is not

19  the dragnet surveillance that they think it is.  But, moreover,

20  there's still the issue with the fact that there is no

21  expectation of privacy in your publicly displayed license plate

22  information or when you're driving on public roads.

23         That's been, you know, well-established, and it

24  doesn't matter if it's a police officer running the plates or

25  the information being captured on an ALPR.  It's just publicly

1 displayed information that is not private for purposes of, you

2 know, the Fourth Amendment the way the plaintiffs claim it is.

3 There's a final one we'd like to note that, you know,

4 we do believe that *Tuggle* is still instructive here and

5 arguably that the issue in *Tuggle* is much more invasive in

6 terms of the information that was made available by the use of

7 the three pole cameras that were focused on the front door of

8 somebody's house day in, day out for 18 months showing every

9 time they came and left their home, when they did that, what

10 they had with them, who visited them, what deliveries they

11 received.  You know, that paints a significantly more

12 comprehensive picture of what's going on with somebody than

13 capturing license plate information on highways and

14 expressways.

15 And as one final comment that I forgot to address

16 before, again, to the idea that the Court would be able to

17 enter an injunction preventing the enforcement of the law in

18 the entirety despite the fact that there isn't class

19 certification, it's true that that type of sweeping relief can

20 be, you know, warranted in very extreme circumstances.  But in

21 order to get there, they would need to at least show that the

22 named plaintiffs are able to obtain relief.

23 And for the reasons that defendant has posited here

24 and in the briefing, the plaintiffs can't state a viable claim

25 in and of themselves, let alone one that would warrant granting

1    that level of relief.

2          THE COURT:  Okay.

3          All right.  Well, thanks to you both.  I think at this

4    point, I'll just ask a few questions.

5          So I think one would be can we just talk a little bit

6    about what -- what exactly you're challenging, and you've both

7    referred to this at different times, but what are -- is the

8    plaintiff challenging the collection in general?  Is the

9    plaintiff challenging the storing?  And how about the use of

10    the data?

11          Because there's -- I mean, there's multiple things

12    that are happening --

13          MR. STEPHENS:  Sure.

14          THE COURT: -- right?  There's the cameras are out

15    there, and then pictures -- cameras are taking pictures --

16          MR. STEPHENS:  And we're focused on the kind of

17    historical storing aggregation, Your Honor.

18          THE COURT:  Okay.

19          MR. STEPHENS:  And, right, and the real time, I think

20    because of exigent circumstances and because, right, I think

21    that, you know, in real-time situations, there will either be

22    exigent circumstances or even if there wasn't, I think probably

23    there could be reason to get a warrant.

24          So I think I would be asking too much if I was asking

25    this Court to order you to rip the cameras out -- them to rip

1    the cameras out, but we think, you know, for the purpose of

2    this injunction, we're simply asking for a warrant process.

3          And now if we get down the road here, I think -- I

4    mean, our position would be that the storing of the data and

5    the aggregation of the data creates the Fourth Amendment

6    violation, so this should be -- the system should be limited to

7    real-time exigent uses if they're going to be used at all.

8          If I can get you that far, an alternative to our

9    argument would be a warrant requirement, a probable cause

10    requirement that they can collect this data, but they cannot

11    actually go in and look for anything unless they go through

12    constitutional process.

13          THE COURT:  Okay.  But then, okay, so if the relief

14    that you're seeking is -- the first-line request is limit the

15    use of the data to exigent uses, so we need to apprehend a

16    suspect or we are looking for a kidnapped person or we're

17    looking for a missing person or -- so if the use of the data

18    were limited to that, or even if the second-line position is,

19    okay, in the alternative, request a warrant before you -- you,

20    the Illinois State Police -- actually use any of the data

21    that's been collected, then I guess what are the consequences

22    of that for standing?  Because then if -- I mean, is there a

23    real -- at that point, is there a real risk that these

24    plaintiffs will be subject to, for example, you know, like a

25    warrant request?

1          MR. STEPHENS:  So, I mean -- I -- I -- whether or not

2    my -- I guess I don't want to speculate as to whether my

3    clients will one day be subject to a criminal investigation,

4    but I think just in terms of standing, I mean, I think the way

5    we look at it is the aggregation of the data and the collecting

6    of everyone's movements is the injury, and so -- but we

7    understand that in the Fourth Amendment context, the Fourth

8    Amendment is a reasonableness standard in basically all cases,

9    and so because of that, you know, the truth is there's probably

10   a lot of permutations of what one could consider reasonable and

11   a lot of ways you could write these policies and these

12   procedures, I think.

13          But I think that the ultimate -- you know, the

14   reasonableness means that we, you know, have to -- I have to be

15   understandable about the real-time tracking about these other

16   things, but I think standing on the aggregation point and

17   pushing back on that and saying that that is the bridge too far

18   and then if we limit that, then that will resolve the injury to

19   my clients and to -- and that that -- but that is -- that gives

20   them the protection that they can get, right?  I mean -- in the

21   same way that, you know, even in the case of a warrant, you

22   know, that's not ideal, but at least then, you know, you have

23   constitutional process and, therefore, the searches are, you

24   know, going to be limited to areas where a court has overseen

25   it and said it's reasonable.

1    So, I mean, I think -- like, I think what it comes

2 down to is, you know, I think this is -- the relief here is

3 kind of a sliding scale of, you know, the more relief we can

4 get, the better.

5    I think that, you know, if I can only get the Court to

6 provide some limited process, I think it's better than nothing.

7 And so that's how I kind of think about it, as the more

8 protection we can get the better, if that makes sense, and so

9 in that sense I think the standing and the resolution of the

10 injury is not binary but is the more privacy protection one can

11 get, the better -- the less injured they are for lack of a

12 better way of putting it.

13    THE COURT:  Okay.  Any other, I guess, comments from

14 either party on the -- well, I guess on the scope of the

15 requested relief?

16    MR. STEPHENS:  I think I explained -- I explained our

17 position.  I don't know if I have anything more to say.

18    MS. JOHNSTON:  Judge, and based on Your Honor's last

19 question, just to clarify our position here because I know that

20 there was a little bit of a shift in the briefing versus the

21 standing argument in the defendants' initial response to the

22 preliminary injunction and motion to dismiss versus the reply.

23    To be clear, it's our position that they do not have

24 standing here under any theory, be it the, you know, retention

25 of the data or the idea that it would be used, but we did note

1    that there were some issues with this vague concept that the

2    retention itself creates an injury.  Again, there is no injury

3    here because there is no Fourth Amendment violation.

4           But, yes, I think it is significant that these

5    individuals have never had the data used against them.  There's

6    no allegation that they have any reason to believe it will be

7    used against them.  Anything to that effect would be pure

8    speculation, and if this was used against them at some point in

9    time, they could file a motion to suppress.  There would be

10    other options there, and then they would have, you know,

11    standing to challenge it in that specific context.  But this

12    kind of just broad statement that they have standing to

13    challenge this information that has never been used against

14    them is insufficient.

15           THE COURT:  Okay.  Let me -- maybe just let me make

16    sure I understand what the request is.

17           So the first-line request for relief is -- there's no

18    request for relief as to please stop using the cameras as I'm

19    hearing it.  It's the first-line request is stop using --

20    continue using cameras, but you can only use the data when

21    there's exigent circumstances.

22           Is that -- is that fair?

23           MR. STEPHENS:  I suppose I should also concede that if

24    they get a warrant for a specific purpose, they could -- that

25    would be an exigent circumstance, I guess, maybe.  I don't

1    know.  Something like that, you know.

2         THE COURT:  Okay.  So the request is --

3         MR. STEPHENS:  The problem is the months and months of

4    data is what we're objecting to.

5         THE COURT:  -- storing the data for months, and right

6    now it's --

7         MS. JOHNSTON:  90 days.

8         THE COURT:  Remind me?  It's 90 days?  Okay.

9         MS. JOHNSTON:  I believe so, Your Honor.

10        THE COURT:  Okay.  And so is the request shorten the

11   period of time, or is the request, okay, you can continue to

12   store for 90 days, but you can only access and search the data

13   either if there's exigent circumstances or if you go through a

14   warrant process?

15        MR. STEPHENS:  Right, yes, Your Honor.

16        Well, as I said, we had -- our first-line position is

17   that, yes, is that they can't keep it for 90 days.  I recognize

18   the line-drawing problem saying it should be 24 hours or one

19   hour or 72 hours, or something -- I realize -- I recognize that

20   sort of issue there.

21        But basically that real-time use is -- and exigent use

22   is acceptable, but the months and months of storing, you

23   know -- this is 90 days, about four months, it's about the same

24   amount of data as what they actually had on Mr. Carpenter in

25   terms of the time, the amount of time of his movements, and I

1    think actually it was similar in *Jones*, too.

2            But, like I said, in our target position where if we

3    can get just a warrant process, then we would be able to keep

4    the data, but they would not be able to open the box without a

5    court's permission basically, and it would be stored on the --

6    it's actually stored on, I believe, the company servers, I

7    believe.

8            And it would be there, and then it actually would be,

9    kind of like *Carpenter*, in *Carpenter* they had to go to the

10   phone company and ask for the data, and here they would have to

11   get a -- go through a process and get the data just like they

12   did there, except there they had a subpoena, and the Supreme

13   Court said you need a warrant.

14           THE COURT:  Just to clarify though, so is the request

15   shorten the length of time, you know, like add a time-based

16   restriction on the storage, or is it -- there's no request as

17   to the length of this time.  It's more, you know --

18           MR. STEPHENS:  I mean -- I think the request would be

19   to set it to zero, Your Honor, but if you want to have a de

20   minimus exception or something, or if the best I can do is get

21   the Court to say only for 24 hours, then I guess I'll take it.

22   But, you know, our idea is that they shouldn't be basically be

23   able to store at all.

24           I realize there's a philosophical thing about, like,

25   the data is generated and what do you do with it, I suppose.

1    Our objection is to the long-term tracking, and so -- I think I

2    should actually clarify that.

3         For purposes of today, the relief for preliminary

4    injunction, we'd just ask for the warrant because we understand

5    that the balancing of the interests means that that's probably

6    we're all going to ask for as the case moves forward.

7         For preliminary injunction, we only asked for the

8    temporary relief for our kind of alternative argument, if that

9    makes sense.

10        THE COURT:  Okay.  And, I'm sorry, I don't mean to

11   keep asking the same question --

12        MR. STEPHENS:  I'm sorry if I haven't been -- if I

13   haven't been helping, Your Honor.  I'm sorry.

14        THE COURT:  No, I'm just -- any time there's a request

15   for an injunction, you know, just over time in my experience, a

16   lot comes down to what exactly are the terms of the injunction?

17   And the injunction has to be specific, and it can't just be --

18   I mean, at the end of the day, when someone requests an

19   injunction, someone has to put -- I have to put pen to paper

20   and write in words --

21        MR. STEPHENS:  Sure.

22        THE COURT:  -- reduce to words what exactly I'm doing,

23   what I'm ordering, and so I guess that's why I'm trying to get

24   clarity about what exactly would that look like; what's the

25   scope of the relief that -- what would the injunction actually

1    say?

2    Because that -- and I'm not saying -- I'm not trying

3    to telegraph, by asking for -- asking that question, I'm not

4    trying to telegraph, you know, how I'm leaning on the

5    earlier -- logically earlier issue, logically, you know, prior

6    issue of -- preceding issue of whether to grant the injunction

7    or not.  It's just that what exactly is the scope of the

8    injunction?  It's important to figure out in order to assess

9    the request.

10   MR. STEPHENS:  And I agree with you.  I actually think

11   that is the most complicated part of the case for us.  That is

12   actually the part that I have thought the most about and why we

13   have kind of an alternative argument there.

14   And I would -- so first of all, I would say for

15   purposes of today, the preliminary injunction, that we wrote

16   specifically as the Court should say that you cannot search the

17   database without a warrant basically.  You cannot access the

18   data that's being stored without going for a warrant.

19   That's what we asked for -- that's the injunction

20   we're asking you to write today is say police cannot use this

21   data without getting a warrant first.

22   So that is the scope of the relief we asked for in the

23   preliminary injunction.  In the longer run, we think the import

24   of our argument is that they shouldn't be able to aggregate the

25   data at all.  But, again, our fallback is that, again, if --

1    if, you know, if we can just get the -- they have to have a

2    warrant, then that would be our alternative argument.

3         So you can write it -- so you can write it either --

4    so you could write the final permanent injunction one day if we

5    win as either -- we would prefer it as they may not store the

6    data.  They may only use these for exigent real time and with a

7    warrant, or if I can't get that, they can store the data, but

8    they have to get a warrant to access it.  Those are our --

9    those are our two -- those are our first request and our

10   alternate request.

11        THE COURT:  Okay.  And --

12        MR. STEPHENS:  Can I say one more thing, Your Honor?

13        THE COURT:  Sure.

14        MR. STEPHENS:  I actually think if we ever get that

15   far, and we're not there today, I mean because this is so

16   policy directed, maybe the answer is if we're to get that far,

17   maybe defendants could have a proposal of a policy or practice

18   or something that, you know, they would accept that would be

19   within the confines of the limitations we're asking for, so

20   that's also, you know, something we'd be open to if we get that

21   far.

22        For today -- but for today, we're focused on the

23   preliminary injunction, and we're asking simply that this Court

24   order -- order the warrant requirement.

25        THE COURT:  Okay.  And would an injunction -- would

1    any injunction apply just to the plaintiffs' data, or would it

2    apply to all data statewide?

3            MR. STEPHENS:  So -- so we've asked for all data --

4    this is actually discussed in the brief that we cite to the

5    Seventh Circuit case law, and they've admitted that under

6    Seventh Circuit case law, it can be appropriate, and we think

7    this is such a circumstance, to issue a general injunction

8    against the program that would -- because that's the way it

9    provides complete relief to the parties and also avoids

10   duplicative litigation, because otherwise everyone is going to

11   have to come in with their own lawsuit about their Fourth

12   Amendment violation.  And we think this is the kind of

13   situation that the Seventh Circuit is talking about when it

14   says that a broader injunction is appropriate.

15           If you don't agree with me on that, we think that's

16   still again on a sliding scale a protection for our clients in

17   the first instance, would still provide them relief from their

18   injury, an injunction limited to our clients would at least

19   provide them the relief from their injury in the case before

20   it.

21           THE COURT:  Okay.  And, again, I want to clarify that

22   by asking these questions, I'm not trying to telegraph what --

23   where I'm thinking of ruling on whether there should be an

24   injunction or not.  I'm just trying to make sure I understand

25   the scope of the request -- or the -- you know, the request for

1    relief and what the request for the injunction looks like.

2          Okay.  I guess moving on to another topic, can anyone

3    or can you clarify, I think you both mentioned at times cases

4    involving ALPRs, but, I'm sorry, can you just come back to that

5    and clarify that?

6          Are there, as far as you know, cases actually

7    involving this type of program?

8          MS. JOHNSTON:  Yes, Your Honor.  There are two that

9    were cited -- let me pull them up.

10         So here, out of the Northern District here, there were

11   two that were specifically cited in defendants' briefing or

12   addressed therein.  The first was *United States v. Brown*, and

13   that is -- let me see -- Case No. 19 CR 949.  It's 2021 U.S.

14   District LEXIS 206153.  I also have the Westlaw here if that's

15   preferable to you.

16         THE COURT:  Sure.  I think it would be good to have

17   both.

18         MS. JOHNSTON:  Okay.  That's 2021 WL 4963602.  And in

19   that case, again, the use of an ALPR reader against a specific

20   defendant was upheld, and it did include discussions

21   specifically about how ALPRs did not -- the agents did not

22   obtain the privacies of Brown's life or exploit a

23   too-permeating police surveillance.  There is no privacy

24   interest in license plates, internal citations there.  I could

25   read those if you like.

1    The court goes on to cite the Supreme Court in *New*

2  *York v. Class*, 475 U.S. 106 at 113, it's 1986, stating --

3  quoting that "every operator of a motor vehicle must expect

4  that the state, in enforcing its regulations, will intrude to

5  some extent upon that operator's privacy," and "it is

6  unreasonable to have an expectation of privacy in an object

7  required by law to be located in a place ordinarily in plain

8  view from the exterior of the automobile.  The exterior of a

9  car, of course, is thrust into the public eye, and thus to

10  examine it does not constitute a search."

11    There's continued discussion within that case.

12    The second case from this district that was referenced

13  was *United States v. Porter*.  That's decided on January 13,

14  2022.  That's Case No. 21 CR 87, and it's 2022 U.S. District

15  LEXIS, 6755, or 2022 WL 124563.  Again, it says similar

16  rationale, and also we've looked -- cited the principle from

17  *United States v. Knotts*, that there's not a reasonable

18  expectation of privacy for information that's voluntarily

19  displayed to the public, especially when traveling in

20  automobiles, and noted that the use of ALPR data did not, once

21  again, kind of show the whole of an individual's movements.

22    And those cases are also discussed within the

23  briefing, starting with defendants' response to the PI and

24  opening brief and through the remaining.

25    THE COURT:  Okay.  And those are criminal cases.  It

1  sounds like at least *Brown* -- I mean, it sounds like these are

2  coming up in basically individual --

3        MR. STEPHENS:  I think they're both suppression

4  motions, I think.

5        THE COURT:  -- individual motions to suppress.

6        MS. JOHNSTON:  Yes.

7        THE COURT:  Okay.

8        MR. STEPHENS:  And -- if you had more, Your Honor, I

9  was going to respond.  I don't know if --

10        THE COURT:  Oh, no.  Please go ahead.

11        MR. STEPHENS:  Yes, so those two cases -- first of

12  all, they're district court cases, so they're not precedential

13  as such.

14        *Porter* actually got a warrant for the GPS tracker, so

15  I'm not even sure if that counts in the end.  *Brown*, again,

16  motion to suppress.  All of the other cases that I could find,

17  at least as of a few months ago, are in our PI motion at pages

18  10 to 11.  There's very little appellate case law.  There's a

19  case from the Massachusetts Supreme Court, which they actually

20  pretty much agree with me in principle, but they say the record

21  before them was insufficient because it only showed two cameras

22  and it didn't show the full system of cameras that you would

23  need to show, and so I read that and I said, okay, let's see if

24  I can show that and create that record.

25        And so in all the other cases, there's another -- all

1   the other cases are basically suppression motions, I think more

2   or less, and they're all basically about an individual

3   defendant, and the record before the court in that case is a

4   couple of data points and doesn't really capture that, capture

5   the full scope of what's going on.

6           There is, in fact, a state court case that agrees with

7   me, and we attached that as an exhibit to our PI motion.  It's

8   not -- I think at least when we filed, it wasn't on Westlaw or

9   LEXIS, but there's actually a -- yes, a state court suppression

10  opinion from Norfolk from this year that actually

11  wholeheartedly agrees with me on every point, so I made sure to

12  attach that to our PI motion.

13          But, yes, the case law specific to ALPRs is pretty

14  limited.  It's mostly district court rulings on suppression

15  motions, and the couple of appellate cases are cited in our PI

16  motion at pages 10 and 11, mainly the Massachusetts case and a

17  concurring opinion from the Ninth Circuit.

18          MS. JOHNSTON:  Your Honor, if I may briefly respond

19  there?

20          Specifically to plaintiffs' assertion about the

21  Massachusetts case which is -- my apologies --

22          MR. STEPHENS:  *Commonwealth v. McCarthy* is what you're

23  talking about.

24          MS. JOHNSTON:  I am, yes.  It's *Commonwealth v.*

25  *McCarthy,* 484 Mass. 493, 2020.  Again, we would disagree with

1    plaintiffs' assessment of that case, as the Massachusetts

2    Supreme Court actually upheld the use of the ALPRs in that

3    situation, specifically noted that "This limited surveillance

4    does not allow the Commonwealth to monitor the whole of the

5    defendant's public movements or even his progress on a single

6    journey." And that's at pages 508 to 509 of that opinion.

7            And, again, I think in some ways, the availability of

8    this being on a motion to suppress does go back and highlight

9    some of the problems with a standing argument, if you will.

10   Again, there's a -- and going into the really extreme level of

11   relief that has been requested here.  They're asking to require

12   warrants for the use of this entirely for every individual

13   across the state.  The scope of relief that was requested and

14   clarified earlier seemed to not even allow for it to be used in

15   exigent circumstances based on what it is that they're asking

16   for.

17           And given that there is a clear remedy that would be

18   available in the event that this information was ever used

19   against a plaintiff, again, it hasn't been now, and there's no

20   allegation that there's a realistic, you know, reason to

21   believe that it will be used against them, they have an avenue

22   by which they can challenge the use through a motion to

23   suppress.

24           I think that just highlights how kind of broad what it

25   is that plaintiffs are requesting here is and especially given

1  the, as defendants would say, you know, fatal flaws to the

2  actual Fourth Amendment claim itself, it highlights how

3  inappropriate an injunction would be in this situation.

4       MR. STEPHENS:  So since we're quoting from that case,

5  what she quoted, I don't know exactly where it is in the

6  opinion, but the opinion goes on to say:  "With enough cameras

7  in enough location, the data from the ALPR would invade

8  reasonable expectation of privacy and would constitute a search

9  for constitutional purposes," but the court said it only had

10  four cameras on -- it was the bridge that goes to is it Cape

11  Cod or Martha's Vineyard, I forget, but it was -- it was --

12  they just -- they said they just had that in the record, they

13  couldn't rule on that theory, but they actually endorsed that

14  theory as I just quoted.

15       The motion to suppress point, I mean, if a motion to

16  suppress at the end cures any Fourth Amendment injury, then the

17  cops could just break down our door and say don't worry about

18  it, file a suppression motion later.  That isn't -- I don't

19  think that's an adequate remedy for what is, in fact, a tort,

20  right?  A Fourth Amendment violation is a tort, and you can sue

21  the cops outside of qualified, you know, qualified immunity

22  aside, for violating it, right?

23       And so I don't think that -- I don't think that's an

24  adequate remedy in the end for what we're talking about.

25       I mean, and as to the scope of the relief or the

1    extremity of our relief, we think the extremity of the

2    surveillance here is beyond the pale, Your Honor, and so we are

3    asking the Court to do something -- to do something in response

4    to that.

5         THE COURT:  Okay.  And then coming back, I guess, to

6    the reasonable expectation of privacy issue, I -- I mean if you

7    could just -- I know you've both addressed this at length, but

8    maybe if you could give just a highlights version of or kind of

9    summary of your point on that.

10        I mean, from what I was hearing, I take it the

11   plaintiff is saying, okay, we -- we understand this is -- the

12   license plates are publicly available, but the problem is with

13   the aggregation of the data.

14        It's not the same as -- so there's certainly case law

15   that if something was in plain view of the police, then the

16   police can use technology to assist in, you know, the plain

17   view, and so that would be true of -- I mean, if you look at

18   any individual license plate reader camera, I think -- I mean,

19   that would be true.  Someone could observe a license plate

20   going by on the highway.

21        But the plaintiffs' argument is, well, it becomes

22   different when you add all these different cameras across the

23   entire highway system, and that's not something that any one

24   individual could observe.

25        I think that's basically the gist.

1        MR. STEPHENS:  Yeah, I think -- so, I mean, not

2   specifically for the qualification, if they put a beeper in the

3   car and they followed the car with like I think it really a

4   directional thing, like it could detect which direction the

5   tracking device was, and so they followed it that way, and the

6   Supreme Court says, well, you're doing it in public, it's not a

7   big deal.

8        They get to *Jones*, and the majority opinion in *Jones*

9   is about the physical attachment of the GPS to the car, but

10  actually there are five justices between the Alito opinion and

11  the Sotomayor opinion, actually five justices who say that

12  tracking Mr. Jones for months like that was different than the

13  individual tail by physical -- by police officers in person.

14        And then *Carpenter* endorses that and says, again, the

15  expectation of privacy is -- I think the way they put it is the

16  whole of the physical movements.  Now, the whole suggests a

17  scope that I think if you read the case, I don't think it means

18  you have to have literally, like, a drone over someone's head

19  24/7 because the cellphone data wasn't quite that accurate and

20  the Fourth Circuit case in Baltimore, that data was not the

21  most perfect thing of everything.  But it was this -- picture

22  of aggregation of physical movements and here we have the

23  aggregation of physical movements.

24        And so that is -- it's the expectation of privacy in

25  the whole of your data is different than any individual data

1  point, and that is the import of the Massachusetts case we were

2  just quoting from, and that is I think just a basic common

3  sense we've all come to understand that any piece of metadata

4  might not be very interesting, but if you put all of our

5  metadata together, you get a pretty scary picture of our lives.

6  THE COURT:  Okay.  And the defense, on the other hand,

7  you're saying -- well, you're obviously emphasizing the fact

8  that the license plate, I mean, it's basically, it's similar to

9  what the *Brown* case was saying.  A license plate, I mean, it's

10  by definition public.  It's required by law to be public.  It's

11  required to be put on the public -- you know, sitting on your

12  car.  It's there to be legible by anyone who sees your car.

13  The highways are public places.

14  MS. JOHNSTON:  Yes, and I'll expand very, very briefly

15  as it related to, and I'll direct the Court to there was some

16  discussion in the *Tuggle* case about the ability to use

17  technology and kind of enhance law enforcement senses in order

18  to, you know, get information that's in the public view so long

19  as they're at a place that the government is legally allowed to

20  be.  So there's some nice discussion there.

21  And then quickly to the point about *Knotts* and *Jones*.

22  So the holding from *Knotts* that there isn't an expectation of

23  privacy in your movement on a public roadway was in no way

24  touched by *Jones*, which came later.

25  *Jones* specifically -- so in *Jones*, they actually

1    physically went and put a GPS tracker on the car, and there the

2    court held that because there was that physical intrusion,

3    basically the analysis on whether or not there was a Fourth

4    Amendment violation could start and stop there.

5         It still said that, you know, in theory, there can be

6    a Fourth Amendment violation even without physical intrusion.

7    And in those situations, go look at the two-part analysis from

8    *Katz,* which is what it is that defendants have largely been

9    discussing, that reasonable expectation of privacy.

10        And as Your Honor appropriately summarized, yes,

11   there's no reasonable expectation of privacy in the publicly

12   displayed information or your travel on public thoroughfares.

13        And then turning last to the aggregate data theory,

14   again, it just goes to this case is limited to the use of ALPRs

15   as designated by the Act.  It does not amount to the type of

16   information that was available in *Carpenter* or *Leaders of a*

17   *Beautiful Struggle* that is discussed again in the *Brown* case,

18   and as such, it does not amount to a Fourth Amendment

19   violation.

20        THE COURT:  Okay.  Is there a difference between the

21   aggregate theory and the mosaic theory that some of the

22   cases -- so there's the *House* case, it mentions the mosaic

23   theory, whether a set of non-searches aggregated together

24   amount to a search because their collection and subsequent

25   analysis creates a revealing mosaic?

1    So is there any difference between the aggregate

2 theory and this mosaic theory that comes up in the cases?  And

3 it looks like this *House* case is quoting an article from Orin

4 Kerr from the Michigan Law Review.

5    MR. STEPHENS:  Yeah, yes, I -- I haven't read

6 Professor Kerr's article, though I'm familiar generally with

7 what he said about this.

8    The -- I think where I would differ from what you just

9 said about it is this, which is we're not alleging -- we're

10 alleging that -- I mean, I guess if you want to understand

11 *Carpenter* as the individual cellphone point would not have been

12 a search.  Subpoenaing one cellphone data point would not have

13 been a search, but subpoenaing four months of them was, I guess

14 *Carpenter* is a mosaic theory kind of case.  I think that's how

15 Professor Kerr thinks of it probably.

16    I think of it -- I don't quite conceptualize it that

17 way, but I think -- we're -- it's getting at a similar idea,

18 and ultimately -- the mosaic theory is not case law, but what's

19 case law is *Carpenter*, so that's what I have to rely on.  That

20 is -- that way of interpreting and understanding it I think is

21 one way, and I think it's useful in some ways.  I think it

22 misses certain things.

23    I think that the idea that, well, these things are are

24 a complete finding on a search.  I'm not sure if that's exactly

25 true, but that might be a little philosophical and academic.

1  If we're talking about the mosaic theory, that's what we're

2  talking about, I suppose.

3          So I don't -- I don't -- I don't know if I

4  specifically want to endorse everything that's said about the

5  mosaic theory, but we're working along similar lines.  I think

6  *Carpenter* is working along similar lines.

7          THE COURT:  Okay.  Well, I mean, if it is the mosaic

8  theory, then how would the Seventh Circuit -- I mean, so

9  there's -- in *Tuggle,* I think that case at some point, I have

10  to go back and look, but I think it says that the mosaic theory

11  has not received the court's, meaning the Supreme Court's full

12  and affirmative adoption --

13          MR. STEPHENS:  Yeah, I think --

14          THE COURT:  -- you know, like *House* --

15          MR. STEPHENS: -- yeah, I think the mosaic theory is

16  one -- Professor Kerr is one way of understanding and, you

17  know, what the regime -- that was sort of I think Professor

18  Kerr's understanding of the regime *Carpenter* was trying to

19  communicate.  I think that's how he thinks of it.  I don't

20  think the Supreme Court has endorsed the theory he said.

21          I think the Supreme Court is right about that, but

22  then they did endorse *Carpenter*, and that's what we're relying

23  on.  So if *Carpenter* is a mosaic theory, I'm relying on a

24  mosaic theory, but I don't -- I actually think they're a little

25  bit different I suppose slightly.  One is more of an academic

1    gloss on the case law we're trying to rely on.

2         I'm not asking this Court to endorse the mosaic

3    theory, if that's what you're asking.

4         THE COURT:  Well, I was just asking because *Tuggle* --

5         MR. STEPHENS:  Yeah.

6         THE COURT:  -- did -- had that comment about the

7    mosaic theory has not received the court's full and affirmative

8    adoption, and then *House* also declined to apply the mosaic

9    theory because the Supreme Court had not directed lower courts

10   to do so, so I just --

11        MR. STEPHENS:  I think I would say, Your Honor, that

12   they're simply saying that's not -- the Supreme Court hasn't

13   gone that far yet.  I don't think they're specifically -- I

14   don't know, maybe -- correct me if I'm wrong, but I don't know

15   that they're at least saying that the Supreme Court ruled

16   against it or anything like that.

17        THE COURT:  Okay.

18        All right, any other comments on the mosaic theory or

19   *Carpenter*?

20        MS. JOHNSTON:  Just briefly to say that I think that

21   there is -- and I don't want to speak definitively.  I think

22   that there is a very slight difference between the mosaic and

23   the aggregate data theory, but under either lens, it's

24   defendants' position that this just doesn't meet that standard.

25   So however it is that you could kind of look at it, this use of

1   ALPRs wouldn't get you to the place where there's a Fourth

2   Amendment violation.

3              THE COURT:  Okay.

4              Sorry.  Just bear with me one second.  I'm checking my

5   notes to see whether I have any other questions.

6              I think I've asked everything that I had.

7              Okay.  Yeah, I don't have any other questions.  So

8   maybe let me just give both of you any opportunity to say any

9   final comments, if you have anything else.

10             MR. STEPHENS:  I think the only thing I had noted is

11  from when my friend was speaking when she talked about that we

12  are not -- that what Illinois is doing here is not the kind of

13  full-on, mass surveillance program that we've alleged, but I

14  think the point I would make is we've alleged, this in the

15  complaint and this is in a motion to dismiss that she has

16  filed, and so the facts are, you know, taken in the light

17  favorable to us in that context.

18             And so to the extent that the Court is unsure about

19  whether the numbers or the data that we put in the complaint,

20  which were the data as of May and I'm pretty sure the numbers

21  are a lot higher now -- in fact, I know they are -- and I think

22  that the answer then is simply let me get the discovery and let

23  me show the dragnet.  Let us establish just what the facts are

24  and just how broad this program actually is, and that's what we

25  would ask for.

1      MS. JOHNSTON:  And as a final point, Your Honor,

2  defendants would assert that this is a motion to dismiss, which

3  means it needs to be based on the allegations of the complaint,

4  and there is a plausibility standard there.

5      And these just kind of general statements about

6  dragnet surveillance that don't actually hold up when you look

7  at the program that's being -- or the statute that's actually

8  being challenged should not allow plaintiff to then go on what

9  was just described as basically a fishing expedition to get

10  more information.

11      Plaintiff has challenged the use of ALPRs, which are

12  specifically on highways and expressways and only capturing

13  that information.  There is no other kind of claim here.  And

14  looking at the existing case law related to the lack of

15  expectation of privacy and publicly displayed information and

16  travels on public roads and the case law from this circuit

17  holding specifically that ALPRs do not amount to, you know, the

18  level of data to kind of meet the aggregate theory threshold

19  set forth in *Carpenter*, plaintiff simply hasn't made adequate

20  allegations to support the claim.  As such, it should be

21  dismissed, and the PI should be denied.

22      THE COURT:  Okay.  I don't have any other questions.

23  So thank you both very much.  Anything -- I guess anything

24  further at all?

25      MR. STEPHENS:  No, Your Honor.

1     MS. JOHNSTON: No, Your Honor.

2     THE COURT: Okay. Thank you again for your arguments

3 today. I really appreciate your taking the time.

4     And I will -- I need some time to consider what you

5 said today, and then also I'll reach out either to -- I'll

6 either send you a ruling in writing or if I decide to rule from

7 the bench, I'll just reach out to schedule a ruling.

8     MR. STEPHENS: Okay.

9     MS. JOHNSTON: Thank you, Your Honor.

10     THE COURT: All right. Thank you.

11  (Concluded at 2:27 p.m.)

12         * * * * *

13  I certify that the foregoing is a correct transcript from

14 the record of proceedings in the above-entitled matter.

15 */s/Kathleen M. Fennell*    *May 30, 2025*
  Kathleen M. Fennell     Date
16 Official Court Reporter

17

18

19

20

21

22

23

24

25